**In re CORRUGATED CONTAINER ANTITRUST LITIGATION.**

**M.D.L. No. 310.**

United States District Court,
S.D. Texas,
Houston Division.

May 17, 1982.

As Amended June 24, 1982.

On Notice to Class Members
Sept. 17, 1982.

On Motion for Final Approval of
Settlements Nov. 30, 1982.

See also, 5th Cir., 643 F.2d 195, 5th Cir., 659 F.2d 1322, 5th Cir., 659 F.2d 1337.

Stephen D. Susman, Susman, Godfrey & McGowan, Houston, Tex., for plaintiffs.

John D. Roady, Hutchison & Grundy, Houston, Tex., for defendants.

### SUPPLEMENTAL ORDER

SINGLETON, Chief Judge.

This Order supplements Pretrial Order No. 64, filed on April 15, 1981, releasing certain grand jury materials (government interview statements) of Edwin A. McCain, an employee of defendant St. Joe Paper Company, and Warren F. Fryburg, Robert Edward Lindeman, LeRoy Wesley Stalder, and Phillip L. Barnum, employees of defendant MacMillan Bloedel, Inc., to plaintiffs in this litigation.

### REMAND

On January 14, 1982, the Court of Appeals for the Fifth Circuit remanded interlocutory appeals nos. 81–2197 and 81–2235 (*In re Corrugated Container Antitrust Litigation Anchor Hocking Corporation, et al. v. St. Joe Container Company, et al., Edwin A. McCain, et al.,* 687 F.2d 52, 667 F.2d 4) for the following limited purposes:

1. Plaintiffs shall move the district court to compel the testimony of any deposition witness whose unavailable testimony is the object of the present appeal and is still needed by plaintiffs.

2. In connection with any such motion, the parties shall disclose to the district court all discovery information obtained since the entry of the disclosure order now on appeal which they contended affects the need for all or any part of the information withheld.

3. The district court is directed to review *in camera* the transcript of the grand jury testimony of any witness whose testimony is sought to be compelled.

4. In light of all information discovered since the district court's disclosure order now on appeal, the district court shall rebalance the need for disclosure of any grand jury transcripts requested against

the need for grand jury secrecy and shall enter a supplemental order which shall be certified to this court as part of the record on this appeal.

In accordance with the foregoing remand, this court now sets forth details of plaintiffs renewed motions, all discovery information obtained since the filing of Pretrial Order No. 64 (disclosure order) which affects the need for these grand jury materials, the review of the grand jury transcripts and depositions of the witnesses, and finally, this court's determination upon rebalancing the need for disclosure against the need for grand jury secrecy.

In filing their renewed motions and responses in this matter, plaintiffs and defendants categorized the witnesses into two groups according to the companies involved. In furtherance, this Court discusses plaintiffs' renewed motions separately: Mr. McCain of St. Joe Paper Company; and Messrs. Fryburg, Lindeman, Stalder and Barnum of MacMillan Bloedel, Inc.

## MOTIONS AND NEW DISCOVERY

Regarding Mr. McCain, plaintiffs filed a "renewed motion for production of transcripts and interview statement of McCain, and stated:

> The Court of Appeals required a motion to compel testimony but that must pertain to Messrs. Barnum, Stalder, Lindeman, and Fryburg who took the Fifth Amendment to all substantive questions. Mr. McCain only relied upon the Fifth once and that pertained to an incident [which occurred] subsequent to his [government] interview.

Renewed Motion for Production of Transcripts and Interview Statement of McCain, P.1, n. *.

Regarding new discovery information plaintiffs explain that no information has been discovered which lessens the need for these grand jury materials. Though Mr. McCain did his best to testify fully in his deposition of January 6, 1981, he could not recall details of his participation in the price fixing conspiracy. Further, these details have not been discovered despite an intense and exhaustive discovery program.

In a separate motion plaintiffs state that defendants have made use of government interview statements to prepare witnesses and to direct the defendants' discovery efforts.[1] Plaintiffs contend that the defendants' use of interview statements waives the right of grand jury secrecy.

Responding, defendants assert that discovery since the disclosure order has been massive, counting 225 depositions taken by plaintiffs in these opt out cases. Of the 13 employees of St. Joe Paper Company deposed since the disclosure order, none invoked his right not to testify under the Fifth Amendment.

Regarding Messrs. Fryburg, Lindeman, Stalder, and Barnum, plaintiffs filed a motion to compel these witnesses to testify over their Fifth Amendment assertion. A renewed motion for release of government interview and/or grand jury transcripts of these witnesses was also filed. Presently, plaintiffs have limited their request to portions of transcripts in the following subject areas: 1) price communications with one or more competitors relating to any opt-out account; 2) price communications with one or more competitors relating to the Northern Indiana and/or North Central Indiana marketing area; 3) price communications with one or more competitors relating to the Ohio marketing area for the time period after 1971; 4) price communications with one or more competitors or with other MacMillan Bloedel personnel relating to 'national accounts' in general or any particular national account, including any opt out account, and including but not limited to efforts to police, adjust, harmonize or explain local or area price differences to such

---

1. *See,* Opt Out Plaintiffs' Motion to Compel Defendant Willamette Industries, Inc., to Produce All Grand Jury Transcripts and Government Interview Statements With the Possession or Control of Their Attorneys, Kirkland and Ellis, filed November 9, 1981 and the Renewed Motion to Compel Defendant Weyerhaeuser Company to Produce Documents, filed September 10, 1981.

accounts; 5) acts of affirmative concealment of the conspiracy; and 6) such other portions as may be necessary to the context and understanding of the portions produced under (1) through (5).

Plaintiffs urge that there remains a compelling and particularized need for these government interview statements due to the continued Fifth Amendment assertion of more than 100 witnesses. Although numerous witnesses have given substantive testimony in the opt out cases, such witnesses are not accorded a high priority as are these four witnesses who had pricing responsibility for opt out plaintiffs' accounts.

A motion to compel testimony does not eliminate this need. Counsel for the four individuals continues to inform plaintiffs that Messrs. Fryburg, Lindeman, and Barnum will persist to invoke their Fifth Amendment right if redeposed and asked the same questions they refused to answer initially, notwithstanding an order compelling their testimony. In the case of Stalder, no questions of an incriminating nature were asked during the deposition; however, counsel for Mr. Stalder indicates that if Stalder were asked incriminating questions relating to his involvement with the Ohio market where his employment responsibility previously lay, he would similarly assert his right under the Fifth Amendment.

Defendants counter plaintiffs' renewed motion with reference to the numerous depositions taken of MacMillan Bloedel witnesses, who did not assert the Fifth Amendment. Particularly, the activities of employees working in both Ohio and Indiana were well covered through depositions of numerous national account personnel.

In summary, both parties state that discovery has been extensive and exhaustive since entry of the disclosure order. Plaintiffs contend this discovery has not been meaningful since the witnesses fail to recall details or continue to assert their Fifth Amendment right not to testify. Defendants contend this extensive discovery by virtue of its abundance must have been meaningful. The majority of witnesses have testified without Fifth Amendment invocations.

This Court notes an additional factor which has occurred since entry of the disclosure order. Both defendants, St. Joe Paper Company and MacMillan Bloedel, Inc., have settled with all of the opt out plaintiffs in this litigation.

## REVIEW OF TRANSCRIPTS

As directed, this Court reviewed *in camera* the transcripts of the grand jury testimony of the witnesses whose unavailable testimony is the object of the present appeal. In addition, this Court also familiarized itself with the depositions of these witnesses.

By undertaking this task, first hand observations could be made of the memory failures and selective Fifth Amendment invocations. The transcripts of grand jury testimony were reviewed for the purpose of determining whether the details sought appeared in the transcripts, and what portions could satisfy plaintiffs' particularized need.

## FULFILLING THE REQUIREMENTS

Disclosure is committed to the discretion of the trial judge and Rule 6(e) of the Federal Rules of Criminal Procedure declares this inter alia:

(2) General Rule of Secrecy. [A]n attorney for the government shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules.

(3) Exceptions.

(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—

(i) when so directed by a court preliminarily to or in connection with a judicial proceeding; ....

■ In our disclosure order of April 15, 1981, this Court exercised its discretion to release certain grand jury materials upon a showing of "particularized need." As consistently interpreted by the Supreme Court, Rule 6(e)(3)(C)(i) allows disclosure of grand jury materials only upon a showing of par-

ticularized need. *United States v. Procter & Gamble Co.,* 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979).

In its remand order, the Fifth Circuit Court of Appeals directs the plaintiffs to move the district court to compel testimony. In the original disclosure order, this Court "felt it to be beyond its power to compel these witnesses' testimony where any actual possibility of prosecution exists." (Pretrial Order No. 64, p. 2, entered April 15, 1981).

Without direction by the Court of Appeals to grant the motions to compel testimony, this Court must again deny the motions, but for different reasons. Since the disclosure order, testimony has been compelled of witnesses by this Court in several districts through its sitting as a judge in each district under 28 U.S.C. § 1407. The circuits reached conflicting decisions,[2] and the Supreme Court has accepted certiorari on this issue.[3] It seems improper to grant motions to compel testimony over Fifth Amendment assertions at this time.

The parties offer one tenable circumstance which may affect the balance between particularized need and grand jury secrecy; the completion of extensive discovery. This Court must determine whether that discovery has been so meaningful as to lessen the need once found to exist. Upon rebalance, this Court again determines that the particularized need outweighs the requirements of grand jury secrecy. The same conclusion is wrought albeit for somewhat different reasons.

As with denial of the motions to compel testimony over Fifth Amendment invocations, circumstances have changed so as to alter this Court's underlying reasons, but compel the same determination.

Interpreting *Douglas Oil,* Judge Caffrey noted:

> [T]he Supreme Court emphasized that the competing interests of the parties seeking and opposing disclosure must be viewed in their appropriate context, that the standard governing disclosure is not a rigid one, and that the burden on the party favoring release of the transcripts is an ever changing one.

*In re Screws Antitrust Litigation,* M.D.L. No. 443, 91 F.R.D. 47, 48 (D.Mass.1981). Despite extensive discovery procedures, Messrs. McCain, Fryburg, Lindeman, Stalder, and Barnum are key witnesses due to their pricing responsibility. They can best support allegations of a price fixing conspiracy. Failure of memory and selective use of the Fifth Amendment prevent meaningful discovery of information crucial to the trial in this litigation.

The typical showing of particularized need arises when a litigant seeks to use the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like. *United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958). The good faith of witnesses who claim to fear prosecution where the statute of limitations has run in most jurisdictions, or who value convenient non-memory is questionable. Adverse witnesses present a ripe circumstance for impeachment and otherwise testing credibility in addition to refreshing their recollection.

The government interview transcripts were prepared by the federal government during the course of a grand jury proceeding, were treated like testimony before the grand jury and were personally reviewed and corrected by the witnesses before being

---

**2.** *In re Corrugated Container Antitrust Litigation, Appeal of Charles J. Franey,* 620 F.2d 1086 (5th Cir., 1980); *In re Corrugated Container Antitrust Litigation, Appeal of Phillip Fleischacker,* 644 F.2d 70 (2nd Cir., 1981); *In re Corrugated Antitrust Litigation, John W. Culy, Appellant,* 662 F.2d 875, (D.C.Cir., 1981); *In re Corrugated Container Antitrust Litigation, Ap-* peal of John Conboy, 661 F.2d 1145 (7th Cir. 1981) (en banc).

**3.** *In re Corrugated Container Antitrust Litigation, Appeal of John Conboy,* 655 F.2d 748 (7th Cir., 1981) *rev'd. on rehearing en banc,* 661 F.2d 1145 (7th Cir.1981), *cert. granted,* 454 U.S. 1141, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982).

authenticated by them. The transcripts are both credible and accurate.

The major change in the Court's reasoning between the first disclosure order and this supplemental order centers on the fact of settlement. The first disclosure order was fashioned to aid opt-out plaintiffs in the development of their cases against St. Joe Paper Co. and MacMillan Bloedel, Inc. This aid is rendered unnecessary as to these defendants. However, plaintiffs must do more at trial than simply show that the remaining defendants were involved in an unlawful conspiracy to maintain and stabilize the prices of corrugated containers and sheets. Plaintiffs must demonstrate that the conspiracy alleged was so widespread and pervasive that it had an *impact* on prices throughout the country. Moreover, plaintiffs chose to request transcripts of witnesses whose testimony they inferred to be far reaching. Mr. McCain states that he is willing to testify fully with the aid of transcripts to refresh his recollection. In the matter of Messrs. Fryburg, Lindeman, Stalder and Barnum, the requests were narrowed to encompass only that discovery information which may aid plaintiffs' proof at trial. Other matters of a personal or embarrassing nature to the witnesses shall remain secret.

## REBALANCING NEED AGAINST SECRECY

Particularized need has been illustrated to prevent questionable good faith tactics such as the selective use of the Fifth Amendment and memory failure, and disclosure will avoid a possible injustice in this pending civil proceeding. Through examination of the transcripts and depositions, it is determined that the disclosure requests cover only material needed. It is necessary, still, to rebalance this particularized need against the importance of grand jury secrecy.

The reasons for grand jury secrecy are: (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219, n. 10, 99 S.Ct. 1667, 1673, n. 10, 60 L.Ed.2d 156 (1979).

With the running of statutes of limitations, the conclusion of grand jury deliberations, and the extreme unlikelihood of retaliatory gestures, *see generally* Pretrial Order 64, entered April 15, 1981, concern for future grand jury secrecy remains. A limited and carefully designed release of a small number of grand jury transcripts shall not detract from the indispensable secrecy of grand jury proceedings. A compelling and particularized need is the only circumstance which allows a court in its discretion to lift the heavy veil of secrecy. Release of grand jury transcripts is not to be used as a mechanism for general discovery.

## CONCLUSIONS

*In camera* examination of these grand jury transcripts allowed this Court to view facts significant to this litigation not heretofore available by reason of the fact that Messrs. Fryburg, Lindeman, Stalder, and Barnum exercised their Fifth Amendment privilege as to pricing communications, and Mr. McCain failed to remember details of such communications. Disclosure is necessary here to uncover relevant, but otherwise unavailable, discovery information. With the release of these government interview statements any future request for

grand jury transcripts by plaintiffs in this litigation will carry a greater burden for showing particularized need since the availability of these transcripts now provides meaningful discovery. For the following reasons,

IT IS HEREBY ORDERED:

1. The motions to compel testimony over Fifth Amendment assertions are DENIED.

2. Plaintiffs' renewed motion for release of the entire government interview statement of Edwin A. McCain is GRANTED.

3. Plaintiffs' renewed motion for release of those portions of the government interview statements of Messrs. Fryburg, Lindeman, Stalder and Barnum relating to the following subjects:

1) price communications with one or more competitors relating to any opt out account; 2) price communications with one or more competitors relating to the Northern Indiana and/or North Central Indiana marketing area; 3) price communications with one or more competitors relating to the Ohio marketing area for the time period after 1971; 4) price communications with one or more competitors or with other MacMillan Bloedel personnel relating to 'national accounts' in general or any particular national account, including any opt out account, and including but not limited to efforts to police, adjust, harmonize or explain local or area price differences to such accounts; 5) acts of affirmative concealment of the conspiracy; and 6) such other portions as may be necessary to the context and understanding of the portions produced under (1) through (5).

are GRANTED.

4. The selections of transcripts relating to the topics mentioned in paragraph number 3 above, and subject to the Order granting release are filed under seal and accompany this supplemental order.

5. Released transcripts are to be used only by counsel of record and their duly retained experts during this litigation, and are not to be discussed or disclosed for any other purpose.

6. Counsel for the plaintiffs are hereby directed to return the transcripts and all copies thereof at the close of this litigation.

ON NOTICE TO CLASS MEMBERS

Pursuant to this court's request, the plaintiffs in the above styled litigation submitted a proposed form of Notice to class members concerning additional settlements in this litigation, applications for attorneys' fees and reimbursement of litigation expenses, and the plan of distribution of the settlement fund. The court has reviewed the proposed Notice and defendants' responses to the form of notice, has made necessary changes and forthwith hereby ORDERS:

1. The form of Notice attached hereto and incorporated herein is the best notice practicable under the circumstances to be sent to members of the plaintiff class. It complies with Federal Rule of Civil Procedure 23(d) and (e), and follows suggested formats offered by the *Manual for Complex Litigation* (5th ed. 1982).

2. On or before October 4, 1982, plaintiffs shall by first-class mail send the Notice attached hereto and entitled, "Notice to Members of the Plaintiff Class, Purchasers of Corrugated Containers and Sheets," to each member of the class whose address is known.

3. During the month of October, 1982, plaintiffs shall cause to be published the summary notice attached hereto entitled, "Important Notice to Purchasers of Corrugated Containers and Sheets," once in *The Wall Street Journal*.

4. Promptly after completion of the mailing and publication, plaintiffs shall file an affidavit with the court setting forth the names and addresses of all members of the class to whom the notice was mailed, and attesting to the publication of the notice.

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE CORRUGATED CONTAINER
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO ALL
CLASS ACTION CASES

M.D.L. No. 310

NOTICE TO THE MEMBERS OF THE PLAINTIFF CLASS,
PURCHASERS OF CORRUGATED CONTAINERS AND SHEETS

Pursuant to Rule 23(d) and (e), Federal Rules of Civil Procedure, and Order of the United States District Court, YOU ARE HEREBY NOTIFIED of certain additional settlements reached before and during trial in this class action litigation, of the impending distribution of all settlement funds which have been or may be finally approved, of petitions for attorneys' fees and expenses now pending before this court, and of certain other matters of which this court has determined you should be aware. This Notice is directed to the members of the plaintiff class, as certified by the court on September 6, 1978. Thus, if you timely and validly requested exclusion from the class pursuant to the Notice directed to you dated August 1, 1979, this Notice and the matters discussed herein do not apply and are of no concern to you.

The plaintiff class is defined as follows: All persons, including individuals, partnerships, corporations, and other businesses, in the United States (excluding defendants and all subsidiaries and affiliates of defendants and all independent corrugated box manufacturers) who purchased corrugated containers or corrugated sheets directly from any defendant, or any subsidiary or affiliate of any defendant, at any time during the period from January 1, 1960 through January 25, 1978.

Out of this class, the court established two subclasses known as the Sheet Plant Sub-

class and the Container Purchaser Subclass. The Sheet Plant Subclass is comprised of those members of the plaintiff class, other than a defendant in the M.D.L. No. 310 or their subsidiaries or affiliates, which:

(a) purchased corrugated sheets;

(b) but did not manufacture corrugated sheets; and

(c) manufactured and sold corrugated containers and/or corrugated fillers, pads, and partitions which were sold for use in or with corrugated containers.

The Container Purchaser Subclass is comprised of all members of the plaintiff class which are not sheet plants.

I.

STATUS OF THIS CLASS ACTION
LITIGATION

A. First Group of Settlements

The Notice directed to the class dated August 1, 1979, enumerated settlements with twenty-four defendants providing for payment in the principal amount of $298,-637,370. This court approved those settlements on December 21, 1979, and certain class members appealed the approval of the settlements to the United States Court of Appeals for the Fifth Circuit. After an initial remand to this court and the entry of additional findings of fact, the Court of Appeals affirmed the approval of the settlements. Certain objecting class members

sought review in the Supreme Court of the United States. The Supreme Court denied review on May 24 and June 1, 1982. As a result, this court's approval of those settlements is now final in all respects.

A separate Notice directed to the member of the Sheet Plant Subclass, dated February 11, 1980, described a settlement on behalf of that subclass with certain of the defendants mentioned below. That settlement provided for the allocation of $11,000,000 from the above settlement fund to the Sheet Plant Subclass, plus certain injunctive relief. This court approved the settlement on March 18, 1980, and the United States Court of Appeals for the Fifth Circuit affirmed that approval on October 29, 1981. This court's approval of that settlement is now final.

From the beginning, these settlement funds have been deposited and invested, and have earned approximately $175 million in interest to date. The court contemplates that a distribution of these settlement funds can occur promptly after the processing of claims is completed. The total amount of all settlements, including those described below, with interest, amounts to over $500,000,000.

B. Jury Trial

Trial of this litigation before a jury commenced May 27, 1980, against three defendants, Alton Box Board Company, The Mead Corporation, and Westvaco Corporation. In the course of the trials, proposed settlements as described below were reached with defendants Alton Box Board Company and Westvaco Corporation. On September 13, 1980, the jury returned a verdict in favor of the plaintiff class and both subclasses against The Mead Corporation (Mead), finding that Mead had participated in a conspiracy to fix, raise, maintain, or stabilize prices of corrugated containers and corrugated sheets sold throughout the United States during a period beginning before January 1, 1964, and continuing at least until December 31, 1975; that nineteen other corrugated manufacturers had participated in the conspiracy with Mead; and

that the conspiracy caused financial damage in the amount of 5% of the purchase price to purchasers of corrugated containers and corrugated sheets in both subclasses throughout the United States. However, the jury found that the plaintiffs did not establish that the defendants fraudulently concealed the conspiracy, which if proven, would have tolled the statute of limitations. Therefore, the statute of limitations limits recovery of the 5% purchase price to the period March 7, 1973 through December 31, 1975.

In January 1981, a Special Master was appointed to hear evidence about the sales of Mead and other co-conspirators to determine the dollar amount to which the 5% overcharge applies. The Special Master, during the period beginning August 1981 through March 1982, has held evidentiary hearings and has developed the evidence of sales of corrugated materials to class members by those companies found by the jury to be members of the conspiracy. Due to the settlement agreement with The Mead Corporation, which is discussed below, the evidence collected by the Master has been ordered by the court to be filed under seal by the Clerk of the Court. The sealed information is not to be revealed to anyone. It is anticipated that this evidence will never be made available to anyone. However, a reasonable estimate of the 5% overcharge as found by the jury could be approximately $300,000,000 to $400,000,000, which amount under the law would be trebled, and from that sum the amount of the settlements with all the other defendants would have been deducted. Absent a settlement with The Mead Corporation, a judgment in that approximate amount could have been entered by the court.

II.

SETTLEMENT WITH THE MEAD CORPORATION

On September 14, 1982, the plaintiff class agreed to settle with Mead. By entering into the proposed settlement, Mead admitted no wrongdoing or liability. The pro-

posed settlement is a compromise of disputed claims, but this compromise does not imply that Mead or any of the other defendants in this litigation are liable for the claims made by the plaintiffs.

This settlement concludes the litigation against all defendants, including Mead. As a result of Mead's settlement, the ongoing proceedings before the Special Master have been terminated. The settlement has also eliminated the likelihood of an appeal of the September 1980 jury verdict, which would have prolonged the final resolution of this litigation for several more years.

Subject to the terms and conditions of the settlement agreement, which are only summarized in this Notice, Mead has agreed to pay the principal sum of $45 million, plus interest at the rate of 9.5%, to be paid in installments at the following times in final settlement of all claims of the plaintiff class, including both subclasses, which are or could be asserted against Mead in this litigation, including both federal and state antitrust law claims, and plaintiffs have agreed to dismiss all such claims against Mead upon final approval of the settlement with Mead described in this Notice:

| Year of Scheduled Payment (all payments due on October 1) | Amount of Anticipated Principal Payment | Anticipated Interest | Amount of Installment Payments |
|---|---|---|---|
| 1982 | $ 1,000,000 | | $ 1,000,000 |
| 1983 | 2,000,000 | $ 4,180,000 | 6,180,000 |
| 1984 | 5,000,000 | 3,990,000 | 8,990,000 |
| 1985 | 5,000,000 | 3,515,000 | 8,515,000 |
| 1986 | 5,000,000 | 3,040,000 | 8,040,000 |
| 1987 | 5,000,000 | 2,565,000 | 7,565,000 |
| 1988 | 22,000,000 | 2,090,000 | 24,090,000 |
| Total | $45,000,000 | $19,380,000 | $64,380,000 |

The above payment schedule, including the amounts of interest, may change should Mead exercise its right to prepay amounts due. This settlement represents a payment of principal of $45,000,000 paid over time at an interest rate of 9.5%, with interest paid on the unpaid balance on an annual basis as it accrues. A surety bond has been purchased to insure the principal amount of $44,000,000 (amount due after 1982). The cost of purchasing the surety bond was divided evenly between the plaintiff class and The Mead Corporation.

A hearing was held on September 14, 1982 to consider class plaintiffs' and defendant The Mead Corporation's joint motion for preliminary approval of their proposed settlement. The essential reasons presented to encourage approval were:

1. Pending Congressional legislation could reduce any judgment against The Mead Corporation to $45,000,000;

2. It is uncertain whether all issues in the jury trial against Mead would be af-

firmed on appeal, and substantial delay would occur due to the appeal taken from any judgment entered; and

3. This settlement brings the total settlement amount to $365,256,747, and this amount exceeds the actual damages suffered by class members.

Based on these factors, the court preliminary approved the settlement of the plaintiff class with The Mead Corporation.

III.

ADDITIONAL PROPOSED SETTLEMENTS

In addition to the settlements which were described in the Notice dated August 1, 1979 and February 11, 1980, and the settlement with Mead described above, proposed settlements have been reached with ten more companies providing for payment in the principal amount of $21,619,377.00.

These funds have been deposited and invested and are earning interest. These settlements were obtained in the period October 5, 1979 through September 3, 1980, some before and some during the jury trial described above. By entering into the proposed settlements, none of the settling defendants has admitted any wrongdoing or liability. The proposed settlements reflect a compromise of disputed claims, and do not imply that any of the defendants in this litigation are liable for the claims made by the plaintiffs.

Subject to the terms and conditions of the settlement agreements, eight settling defendants have agreed to pay the following sums in final settlement of all the claims of the whole class, including both subclasses, which are or could be asserted against them in this litigation, including both federal and state antitrust law claims:

| Date of Settlement Agreement | Defendant | Amount |
|---|---|---|
| March 20, 1980 .............. | Packaging Corporation of America | $8,000,000.00 |
| April 2, 1980 ................ | Fibreboard Corporation, Georgia-Pacific Corporation, Potlatch Corporation | 3,000,000.00 |
| June 26, 1980 ................ | Crown Zellerbach Corporation | 1,000,000.00 |
| July 11, 1980 ................ | Alton Box Board Company | 5,400,000.00 |
| Sept. 3, 1980 ................ | Westvaco Corporation | 975,000.00 |
| Sept. 13, 1982 ............... | The Flintkote Company * | 319,377.00 |

On April 25, 1980, a proposed settlement on behalf of the entire plaintiff class was reached with defendant Fibre Box Association (FBA) a trade association of corrugated manufacturers, which provides in substance for a consent decree enjoining the association from holding zone meetings, from publishing price trend information on the basis of the FBA zones or smaller geographical areas, and from accelerating the frequency of its publication of any shipment and price trend statistics. That agreement also provided for the association's cooperation in the development and presentation of evidence for the jury trial described above. The foregoing description is a summary of the actual settlement agreements, which are available for inspection and copying at the office of the Clerk of the Court, Jesse E. Clark, United States District Court at the Federal Courthouse, 515 Rusk, Houston. Subject to approval of the court, all class members may share in the above settlements, after the deduction of attorneys' fees and costs, on the basis of the allowable purchases by each class member, regardless of subclass.

In addition, separate proposed settlements have been reached on behalf of the two subclasses. On October 5, 1979, representatives of the Container Purchaser Subclass reached a proposed settlement with defendant Southwest Forest Industries, Inc., pursuant to which that defendant has agreed to pay $2,490,000 in settlement of all claims of the plaintiff class members in the Container Purchaser Subclass which are or

* The Flintkote Company, which was not previously named as a defendant in this litigation, owned Hankins Container (Hankins) prior to the acquisition of Hankins by defendant MacMillan Bloedel in 1972. The settlement with Flintkote requires class members to give up all of their claims which are or could be asserted in this litigation, including both federal and state antitrust law claims, against the Flintkote Company, and all such claims against Hankins.

could be asserted against it in this litigation, including both federal and state antitrust law claims. On May 1, 1980, representatives of the Sheet Plant Subclass reached a proposed settlement with defendant Southwest Forest Industries, Inc., pursuant to which that defendant has agreed to pay $435,000.00 in settlement of all claims of the plaintiff class members in the Sheet Plant Subclass which are or could be asserted against it in this litigation, including both federal and state antitrust law claims. Subject to approval of the court, the members of the Container Purchaser Subclass may share in its settlement with Southwest Forest Industries, Inc., after the deduction of attorneys' fees and costs, on the basis of the allowable purchases of each subclass member; and members of the Sheet Plant Subclass may share in its settlement with Southwest Forest Industries, Inc., after the deduction of attorneys' fees and costs, on the basis of the allowable purchases by each subclass member.

Injunctive relief is also part of the proposed settlements on behalf of the subclasses. The settlement agreements with defendants Packaging Corporation of America and Alton Box Board Company each provide for the entry of a decree enjoining such defendants from directly or indirectly, pursuant to an unlawful conspiracy, combination, agreement or understanding:

(i) Exchanging prices or price formulae or fixing, depressing, stabilizing, or otherwise maintaining prices for the sale of corrugated sheets to members of the Sheet Plant Subclass;

(ii) Dividing, allocating or otherwise apportioning sheet plant customers or markets composed of sheet plant customers;

(iii) Refraining from soliciting or dealing with sheet plant customers for corrugated sheets; or

(iv) Predatorily pricing corrugated sheets in relation to corrugated containers or corrugated containers in relation to corrugated sheets.

This consent decree also enjoins those Settling Defendants to which it applies from

predatory pricing with respect to corrugated sheets and containers in relation to one another for the purpose of monopolizing, conspiring to monopolize or attempting to monopolize any relevant geographic market for corrugated sheets or containers in violation of the federal antitrust laws.

Several of the proposed settlements provide that upon approval of the court a portion of the settlement funds not to exceed $1,310,000 would be made available to defray reasonable out-of-pocket expenses (excluding any attorneys' fees) incurred by the representative plaintiffs in prosecuting this litigation on behalf of the plaintiff classes. The court has periodically approved the disbursement of such funds in connection with the preparation for and litigating of the jury trial described above. The total amount available has been disbursed. In addition, on July 20, 1982, the court approved the reimbursement of certain assessments paid by plaintiffs' counsel to Plaintiffs' Steering Committee which were used to partially defray certain expenses of litigation incurred by the Steering Committee and approved by the court as reasonable, to be paid out of the Inland Container settlement fund. The total amount so reimbursed at this time was $1,361,380. On September 17, 1982 the court approved an additional amount of $268,892 to reimburse the Steering Committee for expenses.

### IV.

### APPLICATIONS FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

The attorneys who represented the plaintiffs and the members of the class, and who advanced the costs and expenses of litigation, have applied to the court for the allowance of attorneys' fees and unreimbursed expenses for all work done from the inception of the litigation through and including October 31, 1981. Supplementary applications for work done and expenses incurred after October 31, 1981 will be filed before the hearing described below. It may be that additional applications for attor-

neys' fees and expenses shall be filed after the hearing because of participation of attorneys in the processing of claims of and the distribution of funds to the plaintiff class. Any amounts awarded pursuant to the applications of plaintiffs' attorneys for fees and expenses will be paid from various settlement funds in an equitable manner to be determined by the court.

The fee applications now on file with the court, covering the period through October 31, 1981, request fees of $48,205,421.22 and expenses of $1,491,839.45. This amounts to approximately ten percent of the settlement funds and interest obtained to date. The Fee Committee, appointed by this court on February 18, 1982 and comprised of two lawyers and a businessman not otherwise associated with this litigation, has made certain recommendations which the court has adopted and included in this Notice. The Fee Committee will advise the court throughout the hearing conducted on attorneys' fees. At the hearing, the court will consider evidence of fees charged and collected by counsel representing defendants in this litigation to assist the court to establish a reasonable hourly charge for attorney time.

The fee petitions filed are few in number. A joint petition filed by a majority of plaintiffs' counsel requests the bulk of fees and expenses. The remainder are the subject of petitions filed separately by other plaintiffs' counsel. There are a total of 51 affidavits accompanying the fee petitions filed by plaintiffs' counsel. The fee petitions and accompanying affidavits by individual firms are available for inspection by class members during regular business hours at the following locations:

Jesse E. Clark, Clerk
United States District Court
Federal Courthouse
515 Rusk Avenue
Houston, Texas 77002

Susman, Godfrey & McGowan
1200 Milam, Suite 900
Houston, Texas 77002

## V.

## PROPOSED PLAN OF DISTRIBUTION

Counsel for the class propose that the money from the above described settlements on behalf of the class be distributed on a pro rata basis to *class members* based on valid claims of allowable purchases. Counsel for the class propose that the Southwest Forest settlement funds obtained on behalf of the respective subclasses be distributed pro rata to *subclass members* based on valid claims of allowable purchases. An "allowable purchase" is a purchase of corrugated containers or sheets from any defendant or subsidiary or affiliate or any defendant (as listed in Schedule A at the end of this notice) during the period January 1, 1960 through December 31, 1978. A valid claim form must be completed listing your purchases from any defendant during the period from 1960 through 1978 for you to receive your pro rated share of the settlement fund. The proposed plan of distribution and any disbursements to plaintiff class members are subject to approval of the court, and will be made on the basis of allowable purchases by class members from the proceeds of the settlements after the deduction of court-approved attorneys' fees and expenses.

## VI.

## CLAIMS PROCEDURE

If you have previously filed a claim form in connection with the prior settlements described in the Notice dated August 1, 1979, you may rely upon that claim which will be deemed to have been filed in connection with the present settlements as well. *In that event you need do nothing further at this time.* If you rely upon your previously filed claim, the release and covenant not to sue contained therein will be deemed to apply to the eleven additional defendants whose settlements are described in Sections II and III of this Notice. You had agreed not to sue settled defendant companies in this litigation. Accordingly, if you choose to so rely upon your previously-filed claim, in consideration of your right to receive a share of the settlement funds, you shall be deemed to have covenanted not to sue all

settled defendants including The Mead Corporation, The Flintkote Company, Packaging Corporation of America, Fibreboard Corporation, Georgia Pacific Corporation, Potlatch Corporation, Crown Zellerbach Corporation, Alton Box Board Company, Westvaco Corporation, Southwest Forest Industries, Inc., and The Fibre Box Association and each of their subsidiaries and affiliates (as listed in Schedule A of this Notice), and any of their present or former respective officers, directors, or employees, but no other persons or entities, under the antitrust laws of the United States or of any other state or other jurisdiction or any similar statutory or common law asserting claims which have been, might have been, are now or could be asserted in these actions in connection with corrugated containers and corrugated sheets arising during the time period 1960 through 1978, or which relate to or arise out of the unlawful conspiracy to fix, raise, maintain, or stabilize the prices of corrugated containers or sheets alleged in the Unified and Consolidated Complaint on file in M.D.L. 310, as amended.

If you are a member of the class, but did not submit a claim in connection with the prior settlements, you may nonetheless share in the *additional* settlements described in this Notice, but not the prior settlements, by completing the attached claim form and returning it to the following address, *postmarked on or before December 3, 1982:*

> Claims Processing
> 2100 Travis
> Suite 510
> Houston, Texas 77002

## VII.

## HEARINGS ON PROPOSED SETTLEMENTS, ATTORNEYS' FEES AND PLAN OF DISTRIBUTION

Any class member opposing, commenting on, or supporting the settlement agreements, attorneys' fees, and/or plan of distribution shall file a memorandum detailing any specific objections, comments or support thereof on or before November 12, 1982 with the clerk of this court.

The court will hold a hearing at the Federal Courthouse, Houston, Texas, on November 19, 1982, at 9:30 a.m. to determine whether the proposed settlements and plan of distribution should be approved. Immediately after that hearing, on the same day, the court will hold a conference to establish procedures for an evidentiary hearing on attorneys' fees. That evidentiary hearing on attorneys' fees will be held at the Federal Courthouse, Houston, Texas, on November 29, 1982, at 9:30 a.m., and will consider the extent to which the applications for attorneys' fees and expenses should be approved as fair and reasonable. Members of the class or either subclass may appear and be heard at the above hearings as to any objections they may have to the proposed settlements, plan of distribution and attorneys' fees, only if they file their objections and supporting papers, detailing the nature and reasons for such objections, with the clerk of this court by mail postmarked on or before November 12, 1982.

In addition, all class members wishing to be heard at the hearing on November 29, 1982, must comply with procedures established at the conference on November 19, 1982, following the hearing on the settlements, at the Federal Courthouse, Houston, Texas. The hearings may be adjourned from time to time without further notice to the class.

Copies of any objections filed regarding settlements and plan of distribution must also be served upon the following:

> The Honorable John V. Singleton, Jr.
> United States Courthouse
> Room 11144
> 515 Rusk Avenue
> Houston, Texas 77002
> Stephen D. Susman, Esq.
> Chairman, Plaintiffs' Steering Committee
> Susman, Godfrey & McGowan
> 1200 Milam, Suite 900
> Houston, Texas 77002
> John D. Roady, Esq.
> Chairman, Settling Defendants' Coordinating Committee
> Hutcheson & Grundy
> Two Allen Center
> Houston, Texas 77002

A class member who has no objections to the proposed settlements and plan of distribution does not need to do anything further to indicate his approval.

Copies of any objections and all supporting papers filed regarding any fee applications must be served upon the following:

The Honorable John V. Singleton, Jr.
United States Courthouse
Room 11144
515 Rusk Avenue
Houston, Texas 77002

Stephen D. Susman, Esq.
Chairman of Plaintiffs' Steering Committee
Susman, Godfrey & McGowan
1200 Milam, Suite 900
Houston, Texas 77002

*and* upon each firm to whose application objection is made, all by mail postmarked before November 12, 1982.

## VIII.

### GENERAL MATTERS

1. All documents which you desire to file of record in this case, including any questions or inquiries, should be addressed to:

Jesse E. Clark, Clerk
United States District Court
United States Courthouse
515 Rusk Avenue
Houston, Texas 77002

All documents filed with the Clerk of the Court should refer to the name and number of this section: "In re Corrugated Container Antitrust Litigation, M.D.L. No. 310."

2. This Notice is not all-inclusive. For the full details of the matters discussed in this Notice, including the settlement agreements and petitions for attorneys' fees and expenses, and for further information concerning this litigation, you may desire to refer to the pleadings and other papers filed with the court in this litigation, all of which may be examined and copied at any time during regular office hours at the office of the Clerk of the Court.

Dated: September 17, 1982

/s/ JESSE E. CLARK
Jesse E. Clark, Clerk
United States District Court
515 Rusk Avenue
Houston, Texas 77002

| Supplier Code (for use on claim form) | Defendant | Subsidiaries, Affiliates, Other Trade Names, etc. |
|---|---|---|
| 01 | Alton Box Board Company | none |
| 02 | Boise Cascade Corporation | Blue Ridge Container Co. |
| | | Boise Cascade Corrugated Container Division |
| | | Helper Box Division |
| | | Housatonic Corrugated Box Co. |
| | | Seaboard Container Co. |
| | | The Waterbury Corrugated Container Co. |
| | | Waterbury Container Co. |
| 03 | Champion International Corporation | (See Hoerner Waldorf/Champion International Corporation) |
| 04 | Chesapeake Corporation of Virginia | Baltimore Box Company |
| | | Binghamton Container Co., Inc. |
| | | David Weber Co. |
| | | Miller Container Corporation |
| | | Scranton Corrugated Box Company, Inc. |
| | | Southern Corrugated Box Corporation |

| Supplier Code (for use on claim form) | Defendant | Subsidiaries, Affiliates, Other Trade Names, etc. |
|---|---|---|
| 05 | Consolidated Packaging Corporation | Allied Corrugated Container Company (now Consolidated Packaging Flint, Inc.) |
| | | Battle Creek Box, Inc. |
| | | Better Boxes, Inc. |
| | | Certified Box Company |
| | | Chippewa Paper Products Company |
| | | Consolidated Paper Company |
| | | Custom Made Container Company |
| | | East Chippewa Paper Products, Co., Inc. |
| | | Items For Industry |
| | | Lanzit Corrugated Box Company |
| | | Memphis Corrugated Container Corporation, Inc. |
| | | Meyers Corrugated Box Company (Cleveland Division) |
| | | Outerbelt Container Co., Inc. |
| | | Southern Container Corporation |
| 06 | Container Corporation of America | The Mengel Company |
| 07 | The Continental Group, Inc. | Continental Can Company, Inc. |
| | | Continental Forest Products, Corrugated Division |
| | | Continental Forest Industries, Corrugated Division |
| 08 | Corco, Inc. | none |
| 09 | Crown Zellerbach Corporation | none |
| 10 | Diamond International Corporation | Buffalo Containers, Inc. |
| | | Diamond Container Division |
| | | Mohawk Containers, Inc. |
| 11 | Dura-Containers, Inc. | Bluegrass Containers, Inc. |
| | | Dura-Crates, Inc. |
| | | Tag Container Co., Inc. |
| 12 | Fibreboard Corporation | Fibreboard Paper Products Corp. |
| 13 | Georgia Pacific Corporation | Georgia Pacific Paper Company |
| | | Griffin Container & Supply Co. |
| 14 | Green Bay Packaging, Inc. | Atlanta Container Company of Georgia |
| | | Bay Container Company |
| | | Briggs Packaging Corp. |
| | | Briggs Packaging Division of Green Bay Packaging, Inc. |
| | | Chicago Division of Green Bay Packaging, Inc. |
| | | Custom Packaging Corp. |
| | | Custom Packaging Division of Green Bay Packaging, Inc. |
| | | Fairfield Container Company |
| | | First Container Corporation |
| | | Fort Worth Division of Green Bay Packaging, Inc. |
| | | Fremont Container Company |
| | | Fremont Container Division of Green Bay Packaging, Inc. |
| | | Green Bay Box Company |

| Supplier Code (for use on claim form) | Defendant | Subsidiaries, Affiliates, Other Trade Names, etc. |
|---|---|---|
| | | Jackson Container Corporation |
| | | Jackson Division of Green Bay Packaging, Inc. |
| | | Kalamazoo Container Company |
| | | Kalamazoo Division of Green Bay Packaging, Inc. |
| | | Stevens Container Corp. |
| | | Wausau Division of Green Bay Packaging, Inc. |
| | | Twin Cities Container Corporation |
| 15 | Hoerner Waldorf/Champion International Corporation | Hoerner Boxes, Inc. |
| | | Hoerner Waldorf Division (of Champion International Corp.) |
| | | Waldorf Paper Products Co. |
| 16 | Inland Container Corporation | Anderson Box Company |
| | | Anderson House |
| | | American Forest Products Corporation |
| | | Broward Feed and Grain Company |
| | | Container Systems, Inc. |
| | | Delmarva Containers |
| | | Fibre-Packaging Paper Products, Inc. |
| | | John J. Carroll Company |
| | | Fruit and Produce Packing Company |
| | | H & R Box Company |
| | | J. Don Hall Company |
| | | Hayes Supply Company |
| | | Interstate Supply Company |
| | | Pacific Kraft Corporation, Candalaus, Inc. |
| | | Polygal, Inc. |
| | | Rice, True and Rice |
| | | Schuyler Millham and Sons |
| | | Southeastern Bag and Crate |
| | | Weathers Packaging |
| | | York Container |
| 17 | International Paper Company | none |
| 18 | Interstate Container Corporation | Interstate Container Corporation of Massachusetts |
| | | Interstate Container Corporation of Connecticut |
| 19 | Longview Fibre | Downing Box Company |
| | | General Fibre Box Company |
| 20 | MacMillan Bloedel, Inc. | MacMillan Bloedel Containers, Inc. |
| | | MacMillan Bloedel Packaging, Ltd. |
| | | MacMillan Bloedel Ltd. |
| 21 | The Mead Corporation | none |
| 22 | Menasha Corporation | Carlin Container |
| | | Crown Corrugating |
| | | Hartford Container |
| | | Ohio Valley Container |
| | | Twin Cities Container Corporation |
| | | Wisconsin Container |
| 23 | Olinkraft, Inc. | Forest Products Division of Olin Mathieson Chemical Corp. |

| Supplier Code (for use on claim form) | Defendant | Subsidiaries, Affiliates, Other Trade Names, etc. |
|---|---|---|
| 24 | Owens-Illinois, Inc. | Forest Products Corporation<br>National Container of California<br>Northeast Container<br>Owens-Illinois Glass Company<br>Seaboard Container |
| 25 | Packaging Corporation of America | Commonwealth Container Corp.<br>Detroit Container Corporation<br>Eastern Corrugated Container Corp.<br>Northwestern Corrugated Box Company<br>Potomac Container Corporation<br>Superior Box & Bag Company, Inc. |
| 26 | Potlach Corporation | Potlatch Forest, Inc. |
| 27 | St. Joe Paper Company | none |
| 28 | St. Regis Paper Company | Pollock Container Corporation |
| 29 | Southwest Forest Industries, Inc. | Allied Corrugated Container Co.<br>Continental Box Co.<br>Fox Valley Box Co.<br>General Box Company<br>O'Connor Container Co.<br>Positive Container Co.<br>Premier Container<br>Riverside Box Co.<br>Spartan Corrugated Box Co.<br>Thompson Container Co. |
| 30 | Stone Container Corporation | Ace Box Co., Inc.<br>Albert Corrugated Box Corp.<br>Cameo Container Corp.<br>Charter Oak Container Corp.<br>Grand City Container Corp.<br>Gulf Container Corp.<br>Kraft Corrugated Container, Inc.<br>Leonson Corrugated Box Co.<br>Maryland Corrugated Box Corp.<br>National Packaging Corp.<br>Penn Central Container, Inc.<br>Stone Container Corp. (IL)<br>Stone Container Corp. (PA)<br>Stone Container Corp. (MI)<br>Stone Container Corp. (MO)<br>Tarheel Container Corp. |
| 31 | Union Camp Corp. | Allied Container Corp. |
| 32 | U.S. Corrugated Fibrebox Company | U.S. Corrugated Division of Lacy Diversified Industries, Inc.<br>U.S. Packaging Company<br>U.S. Corrugated Fibrebox Company of Alabama |
| 33 | Western Kraft East, Inc. | none |
| 34 | Westvaco Corporation | Westvaco Container Division, Inc.<br>West Virginia Pulp and Paper Company |
| 35 | Weyerhaeuser Company | Corr-Vac<br>Double-Quad<br>Fiberock<br>Fibre-Kor |

| Supplier Code (for use on claim form) | Defendant | Subsidiaries, Affiliates, Other Trade Names, etc. |
|---|---|---|
| | | Ice-O-Box |
| | | Hydro-Corr |
| | | Multi-Gal |
| | | Pull-Tab |
| | | PVL |
| | | Quad |
| | | Quad-Lock |
| | | Tex-Lock |
| | | Tex-Lock II |
| | | The Keickhefer-Eddy Division of Weyerhaeuser Timber |
| | | Uniwrap |
| | | Valley Corrugated Box |
| | | Weyerhaeuser Hawaii Company |
| | | Weyerhaeuser Southern Company |
| 36 | Willamette Industries, Inc. | Pac-Rite |
| | | Western Kraft Corporation |
| | | Western Corrugated, Inc. |
| 37 | The Flintkote Company | Hankins Container Division |
| | | Western Packaging Division |

**CORRUGATED CONTAINER ANTITRUST LITIGATION**
**CLAIM PROCESSING CHECKLIST**
**GENERAL INSTRUCTIONS**

1. Type or use black ballpoint pen.
2. Print legibly.
3. Copy your completed form and keep for reference.
4. Read all instructions carefully.
5. Purchases from sellers other than defendants or subsidiaries or affiliates listed in Schedule A of the notice will not be allowed as the basis of claims.
6. Exclude all non-allowable purchases from the supplier data, yearly totals and total of all purchases.
7. Do not enter purchase data outside the available boxes on Schedule I. If more than six suppliers are reported, submit additional suppliers on copies of Schedule I.

| Claim Ref. Number | Information Requested | Notes of Explanation | ✔ |
|---|---|---|---|
| ① | Claimant Name and Address | Enter company name and address information. The first line of company name controls filing sequence and future correspondence. | |
| ② | Execute . . . . . . . on behalf of | Enter the name of the individual, partnership, corporation, or other business on whose behalf the claim is being filed. | |
| ③ | Subclass Designation | Place a check next to the subclass designation which applies to your entity. Refer to page 1 for appropriate definitions. | |
| ④ | Filing Status | Indicate whether this is a new claim form or a supplementary claim form. | |
| ⑤ | Supplier Data | Enter the appropriate supplier code from Schedule A and the corresponding supplier name. Then enter purchase dollars by year you are claiming. Only amounts in the boxes are recorded. | |
| ⑥ | Yearly Total of Purchases | Enter the total of each year's purchases from all supplier amounts posted in the boxes. Only use amounts shown in supplier boxes. | |
| ⑦ | Total of All Purchases, 1960 to 1978 | Enter the sum of all yearly total boxes here. Only use the amounts in the yearly total boxes. | |
| ⑧ | Kinds of Products Purchased | Enter the basis of claim that corresponds to your situation. | |
| ⑨ | Source of Data | Check one box for each year purchase amounts are reported. | |
| ⑩ | Signature | Sign an original signature of the person filing for the class member. | |
| ⑪ | Class Member Name | Place class member's name in the space provided. | |
| ⑫ | Notarization | Claim must be notarized and the notary seal affixed. | |

In Re CORRUGATED CONTAINER ANTITRUST LITIGATION
Claims Processing
2100 Travis, Suite 510
Houston, Texas 77002

## VERIFIED STATEMENT OF CLAIM
## SECOND GROUP OF SETTLEMENTS

**Claimant**

① Company Name

Address | State

| Zip

Phone | Area | | No. |

The undersigned has read and is familiar with the contents of the Notice dated September 17, 1982, directed to members of the Class and Subclasses established in the Corrugated Container Antitrust Litigation, M.D.L. No. 310 (S.D. Texas, Houston Division) and is authorized to execute and file this Verified Statement of Claim on behalf of .................................

② ............................. Reference is made to the Notice for the matters described and terms defined therein.

③ The undersigned claimant is a member of the ( . . . ) Container Purchaser Subclass ( . . . ) Sheet Plant Subclass [check one] defined in the Notice; has not elected to be excluded from the class; and upon filing of this Statement of Claim shall be entitled to participate in the settlements described in the Notice in accordance with its terms and the terms of the Settlement Agreements referred to therein. The undersigned understands that the settling defendants do not admit the claims upon which this litigation was based. In consideration of the right to receive a share of the Settlement Funds, the undersigned claimant expressly covenants not to sue Alton Box Board Company, Crown Zellerbach Corporation, Fibre Box Association, Fibreboard Corporation, Georgia-Pacific Corporation, Packaging Corporation of America, Potlatch Corporation, Southwest Forest Industries, Inc., Westvaco Corporation, The Flintkote Company, or The Mead Corporation or any of their present or former subsidiaries or affiliates or any of their present or former respective officers, directors or employees, under the antitrust laws of the United States or of any state or other jurisdiction, or any similar statutory or common law, asserting claims which have been, might have been, are now or could be asserted in these actions arising during the time period 1960 through 1978, or which relate to or arise out of the unlawful conspiracy to fix, raise, maintain, or stabilize the prices of corrugated containers or corrugated sheets alleged in the Unified and Consolidated Complaint on file in M.D.L. No. 310.

Schedule I below sets forth all of the relevant purchases of corrugated containers and sheets made by claimant during the period January 1, 1960 through December 31, 1978, in the United States. These purchases, subject to whatever verification may be required, shall constitute the basis on which claimant's proportionate share of the settlement funds shall be computed.

### PLEASE INDICATE ONE OF THE FOLLOWING:

④ ☐ This is a *new* claim. We *did not* file a claim with respect to the settlements described in the previous notice dated August 1, 1979.

☐ This is a *supplementary* claim. We *did* file a claim with respect to the settlements described in the previous notice dated August 1, 1979, and now wish to supplement, amplify or modify the data contained in that claim, with respect to the subsequent settlements only.

**1138**

**SCHEDULE I**

⑧        Are your claims based on purchases of:

Corrugated containers? ☐

Corrugated sheets? ☐

Both? ☐

**ALL PERSONS FILLING OUT AND RETURNING THE CLAIM FORM SHOULD CHECK THE APPROPRIATE BOXES BELOW FOR EACH YEAR FOR WHICH CLAIMS HAVE BEEN MADE.**

**SOURCE OF DATA ***

| Year | Invoices | Cancelled Checks | Estimates ** Based on Production Or Sales Records | Estimates ** Extrapolated From Records Of Other Years | Other |
|---|---|---|---|---|---|
| 1978 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1977 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1976 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1975 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1974 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1973 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1972 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1971 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1970 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1969 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1968 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1967 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1966 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1965 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1964 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1963 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1962 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1961 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1960 ...... | ☐ | ☐ | ☐ | ☐ | ☐ |

⑨ (bracket spanning 1978–1960)

  * All records supporting your verified claim should *not* be submitted with the claim form but should be retained for inspection by the court or its appointee.

  ** While estimates should be used where no other documentation is available, the court may, upon review of the claims, determine to exclude estimated purchases from "allowable purchases" for the purpose of payment of claims.

The documents relied upon to support this claim will be retained by claimant and will be available for inspection by the court or its appointee.

The undersigned represents and warrants that the statements made herein and the figures set forth herein are true.

Signed ............................. For .............................

*(name and title of person authorized to execute Verified Statement of Claim on Behalf of class member named above)*

*(name of class member filing Verified Statement of Claim)*

IMPORTANT  To participate in distribution of the settlements, return the claim form as described below.

(1) Detach a completed claim form by tearing along the perforation on pages 15 through 20.

(2) Place pages 15 through 20 in envelope and mail to Claims Processing, 2100 Travis, Suite 510, Houston, Texas 77002.

Be sure that the address label on page 20 is correct and is included in material that you mail. *The claim form must be mailed with postmark dated no later than December 3, 1982.*

### VERIFICATION

On this .... day of ..............., 1982, before me personally appeared ..............
..............., to me known, and known to me to be the same person described in and who executed the above instrument, and he/she acknowledged to me that he/she executed the same and that the information it contains is true to his/her knowledge.

.............................................
*Notary Public*

### Return Address

CORRUGATED CONTAINER ANTITRUST LITIGATION

CLAIMS PROCESSING

2100 TRAVIS, SUITE 510

HOUSTON, TEXAS 77002

| BULK RATE |
|---|
| U.S. POSTAGE |
| PAID |
| HOUSTON, TEXAS |
| PERMIT 600 |

## ON MOTION FOR FINAL APPROVAL OF SETTLEMENTS

This cause comes on to be heard on class plaintiffs' motion for final approval of settlements with eleven defendants in this multidistrict litigation which is based upon allegations of price-fixing within the corrugated container industry.

The settlements before the court for final approval total approximately $66 million.

Twenty-two million dollars of these settlements have been deposited in Houston banks and are earning interest. The remaining $44 million will be paid out over a period of six years, and will accrue interest. By the end of this year, these settlements, along with settlements previously approved, will have a present value of over $550 million.

The settlements to be approved are listed as follows:

| Date of Settlement | Defendant Agreement | Amount |
|---|---|---|
| October 5, 1979 | Southwest Forest Industries, Inc. | $ 2,925,000.00 |
| March 30, 1980 | Packaging Corporation of America | $ 8,000,000.00 |
| April 2, 1980 | Fibreboard Corporation, Georgia-Pacific Corporation, Potlatch Corporation | $ 3,000,000.00 |
| April 25, 1980 | Fibre Box Association | injunctive relief only |

| Date of Settlement | Defendant Agreement | Amount |
|---|---|---|
| June 26, 1980 | Crown Zellerbach Corporation | $ 1,000,000.00 |
| July 11, 1980 | Alton Box Board Company | $ 5,400,000.00 |
| Sept. 3, 1980 | Westvaco Corporation | $ 975,000.00 |
| Sept. 13, 1982 | The Flintkote Company | $ 319,377.00 |
| Sept. 14, 1982 | The Mead Corporation | $45,000,000.00 |

Federal Rule of Civil Procedure 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." The Court of Appeals for the Fifth Circuit has held that "in determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable. . . ." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977). *Accord, In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 197 (5th Cir.1981).[1] Further, the *Manual for Complex Litigation* advises courts on the "Criteria and Procedure for Approving Class Action Settlements." § 1.46 (5th ed. 1982).[2]

Following these directives, these settlements were preliminarily approved by this court at a hearing held on September 14, 1982. No objections were made to the settlements at that hearing. Class notices delineating the facts of the settlements and advising of the hearing on final approval were mailed to class members. Order; Notice to the Members of the Plaintiff Class, Purchasers of Corrugated Containers and Sheets, *In re Corrugated Container Antitrust Litigation,* M.D.L. No. 310 September 17, 1982. Subsequently, a hearing on final approval was held on November 19, 1982. Neither class members nor other parties to these settlements objected to the gross amount of the settlements. Conversely, a number of class members expressly supported these settlements at the final hearing. Accordingly, based on the court's experience and knowledge of this litigation, appraisal of the factors involved in the settlements, and concern to act in the best interest of the class, the court hereby approves these settlements finding them to be fair, reasonable, and adequate and sets forth findings of facts and conclusions of law which support this approval.

1. The Fifth Circuit announced the general standard for determining the fairness and adequacy of a class action settlement as follows:

Case law provides us with general ground rules: 'The settlement terms should be compared with the likely rewards the class would have received following a successful trial.' . . . And: 'the strength of the case for plaintiffs [must be] balanced against the amount offered in settlement.' . . . We think this requires a three-step process. First, the district court must evaluate the likelihood that plaintiffs would prevail at trial. Second, the district court must establish a range of possible recovery that plaintiffs would realize if they prevailed at trial. And third, guided by its findings on plaintiffs' likelihood of prevailing on the merits and such other factors as may be relevant, the district court must establish, in effect, the point on, or if appropriate, below the range of possible recovery at which a settlement is fair and adequate. *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 212 (5th Cir.1981) (citations omitted).

2. The trial judge, in making his determination, may be guided by the following and other relevant considerations:

1. The most important factor is the strength of the case on the merits, balanced against the amount offered in the settlement;
2. The defendant's ability to pay;
3. The complexity, length, and expense of further litigation;
4. The amount of opposition to the settlement.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. HISTORY OF THE LITIGATION

#### A. The Civil Complaints

This litigation began on March 7, 1977, with the filing of the first of 51 class complaints which were subsequently consolidated before the court by the Judicial Panel on Multi-District Litigation pursuant to 28 U.S.C. § 1407. *In re Corrugated Container Antitrust Litigation,* 447 F.Supp. 468 (J.P. M.L.1977). The complaints, which named 37 defendants, alleged that, since at least January 1, 1960, the defendants had engaged in a nationwide conspiracy to raise, fix, maintain, and stabilize the prices of corrugated containers and sheets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. On September 6, 1978, the court certified a class of all persons in the United States who purchased corrugated containers or corrugated sheets from any defendant between January 1, 1960, and January 25, 1978. *In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244 (S.D.Tex.), *mandamus denied,* No. 78–3684 (5th Cir.1978). The court subsequently divided the single class into two subclasses: one composed of sheet plant purchasers and the other comprised of all other purchasers of corrugated containers and sheets. Pretrial Order No. 7, December 26, 1978.

#### B. The Companion Criminal Cases

The civil complaints were precipitated by a federal grand jury investigation which culminated on January 25, 1978, in two indictments—one misdemeanor and one felony—charging 14 companies and 26 individuals with participating in a conspiracy east of the Rocky Mountains to fix prices of corrugated containers and sheets. *United States v. International Paper Co.,* No. H–78–11, and *United States v. Boise Cascade Corp.,* No. H–78–12. The basic allegations in the criminal cases were substantially similar to those in the civil cases, although the civil cases were broader in scope. Almost all of the defendants pleaded *nolo contendere.* The Mead Corporation, (Mead), The Continental Group, Inc. (Continental Group), and seven individuals entered pleas of not guilty and proceeded to trial on January 22, 1979. Three months later, on April 27, 1979, these defendants were acquitted by jury verdict.

#### C. Settlements with Other Defendants in the Civil Cases That Received Final Approval

Prior to the criminal trial, plaintiffs negotiated settlements with 24 defendants. This court found those settlements to be fair, adequate and reasonable and, on December 21, 1979, gave final approval to them. *In re Corrugated Container Antitrust Litigation,* 1980–1 Trade Cas. ¶ 63,163 (S.D.Tex.1979). On appeal, the Fifth Circuit remanded for the purpose of having this court enter additional findings of fact and conclusions of law. *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195 (5th Cir.1981). On June 4, 1982, this court filed additional findings of fact and conclusions of law, again finding the settlements to be fair, adequate and reasonable. *In re Corrugated Container Antitrust Litigation,* 1981–1 Trade Cas. ¶ 64,114 (S.D.Tex.1981). The Fifth Circuit subsequently affirmed this court's final approval of those settlements, holding that they were fair, adequate and reasonable, and within the discretion of this court. *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322 (5th Cir.1981). The Supreme Court denied a petition for certiorari. *CFS Continental, Inc. v. Adams Extract Co.,* —— U.S. ——, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982).

#### D. The Post-Acquittal Settlements

Following the acquittals in the criminal trial and before the class trial began on June 9, 1980, plaintiffs reached settlements with seven other defendants.[3] During the class trial, plaintiffs settled with Alton Box

---

3. These defendants were Southwest Forest Industries, Inc., Packaging Corporation of America, Fibreboard Corporation, Georgia-Pacific Corporation, Potlatch Corporation, The Fibre Box Association, and Crown Zellerbach Corporation.

Board and Westvaco Corporation. Each of these settlements has been given preliminary approval by this court, and the final approval of them is the subject of this opinion.

### E. The Civil Trial

On June 9, 1980, the class trial began against the then three remaining defendants: Mead, Alton and Westvaco. Following the Alton and Westvaco settlements, Mead was the only defendant to proceed to verdict. On September 13, 1980, the jury returned a verdict against Mead, finding Mead and 18 other companies had conspired to fix the prices of corrugated containers and sheets sold throughout the United States. The jury found that the container and sheet plant purchasers were damaged by five percent. The jury found against plaintiffs on the issue of fraudulent concealment and the damage period, therefore, was limited to March 7, 1973, to December 31, 1975, inclusive.

### F. The Post-Verdict Proceedings

Over Mead's objections, the court appointed a Special Master on January 27, 1981, to conduct post-verdict proceedings to obtain evidence to which the five percent overcharge could be applied. Following discovery by plaintiffs, the Special Master, beginning in March 1981, conducted hearings through August 1982. An additional proceeding was to be scheduled by the Special Master when the settlement was reached.

Although no judgment had been entered, on July 21, 1982, Mead filed its motion for entry of judgment notwithstanding the verdict or, in the alternative, for new trial, or for a contested partial judgment. The court deferred ruling on the motion until after the entry of a judgment.

On September 14, 1982, plaintiffs agreed to a settlement with Mead which culminated months of negotiations. Under the terms of the settlement agreement, Mead agreed to pay the principal sum of $45 million, plus accumulated interest at 9.5 percent, over six years, beginning October 1, 1982. The Mead settlement is higher in both total dollars and in dollars per point of market share than the amounts paid by any other defendant. It brings this lengthy and costly class litigation to a conclusion.

### II. PREVIOUS GENERAL FINDINGS OF FACT THAT SUPPORT THESE SETTLEMENTS

In Pretrial Order No. 31, this court granted final approval of 24 prior settlements in this action. The grounds on which those prior settlements were approved are set forth in this court's "Additional Findings of Fact and Conclusions of Law Concerning Class Action Settlements," *In Re Corrugated Container Antitrust Litigation,* 1981–1 Trade Cases ¶ 64,114 (S.D.Tex.1981) (*Additional Findings*). The *Additional Findings* were approved by the Court of Appeals in *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322 (5th Cir. Oct. 29, 1981), and, the Supreme Court denied a petition for certiorari to review the prior settlements on May 24, 1982.

The *Additional Findings* included many general findings which related to the 24 prior settling defendants as a group. *See* "Findings and Conclusions of General Relevance" set forth in the *Additional Findings,* 1980–1 Trade Cases ¶ 64,114, at 76,692–696. These general findings are equally applicable to and support the settlements and accordingly are incorporated in these findings.

### III. SPECIFIC FINDINGS OF FACT SUPPORTING INDIVIDUAL SETTLEMENTS

#### A. Southwest Forest Industries, Inc.

Southwest Forest Industries, Inc., (Southwest Forest) entered into a settlement agreement with the Container Purchaser Subclass on October 5, 1979, pursuant to which Southwest Forest paid $2,490,000 in settlement of all claims of the members of that class. On May 1, 1980, Southwest Forest entered into a settlement agreement with the Sheet Plant Subclass pursuant to which Southwest Forest paid $435,000 in settlement of all claims of the members of that class.

In comparison with many of the other defendants in this litigation, the sales of Southwest Forest to class members during the relevant time period were small, accounting for less than 1.5% of the total sales of defendants. Notwithstanding this small market share, Southwest Forest's total settlement of $2,925,000 represents approximately $2 million per point of market share, a figure greater than that paid by several other defendants.

Following an investigation of more than two years, on January 25, 1978, a federal grand jury sitting in Houston, Texas, returned two indictments alleging that 14 companies and 26 individuals had participated in an 18-year, nationwide conspiracy to fix the prices charged for corrugated containers. Although Southwest Forest was a respondent to a subpoena duces tecum issued by that grand jury and was a subject of the grand jury investigation, neither Southwest Forest nor any of its employees was charged with any antitrust violation as a result of that investigation.

Prior to its settlement with the two subclasses as described above, representatives of both subclasses conducted extensive discovery against Southwest Forest, including the taking of nearly twenty depositions of key current and former Southwest Forest employees. Based upon that extensive record, representatives for both subclasses determined that it was in the best interests of the class to settle all claims against Southwest Forest.

For the foregoing reasons, the court finds the settlement between class plaintiffs and Southwest Forest Industries, Inc., to be fair, reasonable and adequate and this settlement is finally approved.

### B. Packaging Corporation of America

Packaging Corporation of America (Packaging Corporation) settled with the class in March 1980, a few months before the trial in this case started. Packaging Corporation agreed to pay $8,000,000 to the class and agreed to entry of a consent decree. Several factors justify final approval of this settlement. Packaging Corporation was not indicted by the grand jury. Evidence concerning Packaging Corporation of America's (Packaging Corporation) participation in the conspiracy was uneven, and varied greatly from plant to plant. The ten Packaging Corporation employees who were deposed denied involvement in the conspiracy, and one former employee who was interviewed claimed extensive participation in the conspiracy.

However, a number of Packaging Corporation's plants appeared to abide by the antitrust laws, and plaintiffs decided that a substantial settlement prior to trial would be in the best interest of the class so that the civil trial could focus primarily on the activities of the remaining defendants. With respect to this company and others, settlement was obtained before trial when plaintiffs faced the enormous difficulties of proof described in detail by this court in its *Additional Findings* concerning the settlements which already have been approved.

Despite the factors indicating a difficult case against Packaging Corporation, the settlement is a substantial one. It is the largest post-acquittal settlement and represents 14.3% of Packaging Corporation's operating profits from these operations during the 1973–1975 period. The settlement was the result of several months of hard, arms-length bargaining. Both sides were forced to move away from their original positions.

Therefore, this court finds that the settlement between the plaintiff class and Packaging Corporation of America is fair, reasonable and adequate, and it is finally approved.

### C. Fibreboard Corporation, Potlatch Corporation, and Georgia-Pacific Corporation

On April 2, 1980, the class, on behalf of both the Container Purchaser Subclass and the Sheet Plant Subclass, entered into a joint settlement with Fibreboard Corporation (Fibreboard), Potlatch Corporation (Potlatch) and Georgia-Pacific Corporation (Georgia-Pacific).

That settlement provided for a payment of $3,000,000 on behalf of the three settling defendants in exchange for a judgment in favor of those three defendants and a release of all claims against those three defendants which are, or could have been, asserted against them in this litigation, including both federal and state antitrust law claims. The settlement likewise provided that the sum of $187,500 could be paid out of the settlement sum, to pay costs and expenses incurred by plaintiffs, of which $187,500 is not reimbursable to those settling defendants.

Fibreboard, Potlatch and Georgia-Pacific were not indicted by the Houston grand jury that investigated the corrugated container industry, and none of these companies nor any of their employees were named as unindicted coconspirators in the Government's Bill of Particulars. Unlike most of the other defendant companies, no employees of any of these companies were even called upon to testify before the Houston grand jury or to give interview statements to the Government, although, in fact, Georgia-Pacific had been named by the Government as a target of the alleged conspiracy.

Plaintiffs long considered Fibreboard, Potlatch and Georgia-Pacific in a separate category among defendants because of the relative lack of evidence against them. Plaintiffs conscientiously pursued discovery of these three defendants, deposing a total of twenty-two present and former employees of these three defendants, including sales managers and plant managers. All denied, categorically, any participation in pricing communications with competitors. No employee of any one of these defendants asserted the Fifth Amendment in connection with that discovery. Counsel for the plaintiff class contacted additional potential witnesses and reviewed millions of documents produced by these and other defendants without developing substantial inculpating evidence. Significantly, the settlements with these defendants were entered into after this extensive discovery.

Potlatch left the corrugated business in October 1975; summary judgment in Potlatch's favor for the period subsequent thereto was granted, and Potlatch was no longer a defendant herein for that period.

Plaintiffs' complaint alleged that Fibreboard, Potlatch and Georgia-Pacific were part of a nationwide conspiracy to violate the antitrust laws which included, among others, The Mead Corporation. Plaintiffs' action against Mead went to trial. At that trial plaintiffs attempted to show that Mead and all the other defendants, including Fibreboard, Potlatch and Georgia-Pacific, participated in the alleged conspiracy. It was in plaintiffs' interest to establish that as many of the defendants as possible had participated in the conspiracy, in order to increase the amount of the damage award against Mead. The jury found that certain defendants, including Mead, had participated in the alleged conspiracy but expressly found that Fibreboard, Potlatch and Georgia-Pacific had not participated in the conspiracy.

The Fibreboard, Potlatch, and Georgia-Pacific settlement provided several significant benefits to the plaintiffs. These defendants agreed to leave their sales in the case with respect to plaintiffs' claims against nonsettling defendants, and they also agreed to cooperate in certain ways in connection with discovery and plaintiffs' possible need to use their employees as trial witnesses in the trial against nonsettling defendants. The settlement, coming on the eve of trial, also allowed plaintiffs to simplify their case greatly against the remaining defendants and eliminated the possible serious detriment to plaintiffs' case that could have resulted from having present at trial three defendants against which they had very little evidence. In addition, the nonrefundable amount of $187,500 made available to plaintiffs by this settlement provided a substantial sum to help defray plaintiffs' expenses at a time when their trial preparation costs were mounting rapidly. This settlement was the first M.D.L. No. 310 class action settlement to permit use of settlement funds to defray plaintiffs' litigation costs.

Consequently, the court finds and concludes that the settlement between the plaintiff class and Fibreboard Corporation, Potlatch Corporation, and Georgia-Pacific Corporation is fair, reasonable and adequate, and it is finally approved.

### D. Fibre Box Association

The Fibre Box Association's (F.B.A.) involvement in the Corrugated Container litigation began in October 1976 when the FBA received a subpoena to produce certain of its business records to a federal grand jury seated in Houston, Texas. All documents responsive to the subpoena were produced in February 1977. The grand jury investigation lasted more than two years; however, upon the conclusion of its investigation, the grand jury did not indict the FBA or any of its employees, and the FBA was not named in the Bill of Particulars filed by the Government in the criminal case. Furthermore, the Government did not have any FBA employee testify before the grand jury nor did it seek to have any FBA employee testify at trial. Two employees did provide testimony on behalf of one of the defendant corporations, mainly to describe the FBA and its activities.

The only reference to the FBA in the body of the Unified and Consolidated Complaint was that the FBA had "various committee meetings and disseminated certain statistics which were used or were usable by the defendants in furtherance of the conspiracy alleged herein." Unified and Consolidated Complaint, paragraph 11.

Plaintiffs have taken extensive discovery of the FBA. In addition to providing the federal grand jury documents, the FBA has provided extensive answers to plaintiffs' voluminous merit interrogatories, and in late 1979, plaintiffs were given access to FBA files and selected in excess of 35,000 documents for copying. In early 1980, plaintiffs deposed four past and present FBA staff members and interviewed other past and retired employees.

Plaintiffs would have considerable problems in proving their case against the FBA. Despite the plaintiffs' aforementioned dis-

covery, plaintiffs have been unable to establish any evidence that the FBA was an active participant in the exchange of information which constitutes the core of plaintiffs' case. The record clearly reveals that all FBA functions were carried out with advice of experienced counsel, and in those occasional instances in which witnesses testified that price exchanges occurred at FBA meetings, it was unequivocally established that the conversations occurred prior to or after the meetings and out of the presence of FBA counsel and staff. In no instance has any witness testified that the FBA was a party to the alleged illegal activities.

The FBA entered into a settlement agreement with the plaintiffs on April 25, 1980. The agreement contains various cooperation provisions which provided the plaintiffs with a number of important benefits relating to the plaintiffs' trial preparation: e.g., the continued right of plaintiffs to the discovery from the FBA as if it were a party; the obligation of the FBA to produce documents in Houston, Texas, upon plaintiffs' request; the obligation of the FBA to make its employees available for interview by plaintiffs or to make them available at trial at plaintiffs' request; the obligation to provide plaintiffs with documents made available to nonsettling defendants; the obligation to make available to plaintiffs the documents provided to Glassman-Oliver Economic Consultants, Inc., one of defendants' experts; the obligation of the FBA staff and counsel to assist plaintiffs in answering questions and FBA documents and procedures. In addition, the settlement agreement secures FBA's agreement to a consent decree whereby the FBA agrees to be enjoined and restrained from the following activities or programs for a ten-year period: (i) reinstituting the holding of zone meetings which were held on a regular basis from at least 1960 to 1976 and at which sales personnel and plant managers of a number of companies were often in attendance; (ii) publishing price trend information of any nature on the basis of geographical units known as FBA zones or any smaller geographical areas; and (iii)

accelerating the frequency of publication of the shipment and price trend statistics which it now publishes.

During the course of trial preparation and trial, the aforementioned cooperation provisions of the settlement agreement proved to be extremely helpful to the plaintiffs in prosecuting their claims. On numerous occasions, plaintiffs availed themselves of the cooperation provisions; plaintiffs were able to secure, on a prompt basis, answers to questions and documents which very well may have been otherwise unobtainable.

For the foregoing reasons, the court finds the settlement between class plaintiffs and the Fibre Box Association to be fair, reasonable and adequate and it is finally approved.

### E.  Crown Zellerbach Corporation

Crown Zellerbach Corporation (Crown Zellerbach) agreed to settle with the plaintiff class on June 26, 1980. The settlement agreement obligates Crown Zellerbach to pay within thirty days of execution $1,000,-000 in cash for the benefit of the class. Out of that settlement fund an amount of $62,-500, with court approval, was used to defray the costs and expenses incurred in connection with the prosecution of this litigation or in connection with the giving of notice of the class action and of the proposed settlement to members of the class. Any portion of the $62,500 so paid out is not refundable to Crown Zellerbach should the settlement eventually be disapproved.

Crown Zellerbach was neither indicted nor were any of its employees named as coconspirators. The criminal trial testimony contained numerous references to Crown Zellerbach's reputation for refusing to discuss prices with competitors after the decision in *United States v. Container Corporation,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) (*Container* ).

The grand jury transcripts contain only a sprinkling of references to Crown Zellerbach. All of the former or present employees produced by this company for deposition testified on the merits and uniformly de-

nied participation in any agreement or understanding with any competitor and, while a few admitted having occasional "price verification" communications prior to *Container,* all denied any knowledge of or participation in any communications concerning price after *Container.* Crown Zellerbach's documents yield no confirmation of any pricing communications between Crown Zellerbach and its competitors. Likewise, the documents produced by other defendants in M.D.L. No. 310 show no communications regarding price with this company's employees. The only merit testimony explicitly naming Crown Zellerbach employees as engaging in pricing communications in the 1960's and into the middle 1970's was that of one witness, who was employed by International Paper in the Texas Rio Grande Valley. The Crown Zellerbach employee referenced in this witness's testimony was deposed in this proceeding, and denied ever having any pricing communications with any competitor. Thus, except for the testimony of one witness and the limited number of pricing communications occurring prior to *Container,* any evidence against Crown Zellerbach was circumstantial.

The proposed settlement with Crown Zellerbach came on the verge of trial, after months of intensive discovery and preparation for trial against Crown Zellerbach, as well as the other nonsettling defendants. Crown Zellerbach and plaintiffs had attempted at an earlier date to settle their differences; Crown Zellerbach was party to the initial settlement negotiations between plaintiffs and Georgia-Pacific, Fibreboard, and Potlatch. Thus, the settlement with Crown Zellerbach was accomplished only after negotiation additional to that necessary to effectuate the Georgia-Pacific, Fibreboard and Potlatch settlement. Clearly, the settlement with this company was the result of vigorous, arms-length bargaining between two adversaries with full knowledge of the evidence. The proposed settlement reflects the careful, good faith weighing by each party, individually, of the benefits of settlement then as opposed to any potential future benefits to be derived from trial.

In weighing the chances of a verdict favorable to the class with Crown Zellerbach at trial, the evidence developed against Crown Zellerbach was not so incriminating as that against the remaining nonsettling defendants. No benefit could be derived in terms of enlarging the limits of any recovery at trial by keeping this company in the suit since the settlement agreement provided that their sales would remain in the case. Further, the inclusion of Crown Zellerbach at trial would have complicated the presentation of plaintiffs' case, lengthened the trial and increased the litigation costs for plaintiffs. By eliminating Crown Zellerbach from the litigation, plaintiffs avoided the possible negative influence at trial of a comparison between Crown Zellerbach and the remaining nonsettling defendants, secured recovery against Crown Zellerbach despite any outcome at trial and without prejudice to the rights of the plaintiff class to seek legal redress, and put at their disposal $62,500 to be used to defray the costs of the continued prosecution of this litigation against the remaining nonsettling defendants. Thus, the benefits of settlement unquestionably outweighed the risk of submitting the case against Crown Zellerbach to the jury for any possible rewards from trial.

The court finds and concludes that the settlement agreement between the class plaintiffs and Crown Zellerbach Corporation is fair, reasonable and adequate, and it is finally approved.

### F. Alton Box Board Company

On July 11, 1980, Alton Box Board Company (Alton) entered into a settlement agreement with the plaintiff class. The settlement occurred after more than six weeks of continuous jury trial in the civil class action, but before class plaintiffs concluded their case in chief and before Alton presented its defense.

Alton was one of the companies indicted for a felony violation of the Sherman Act in *United States v. International Paper Co.,* Cr. No. H–78–11. Alton pleaded nolo contendere and was fined $143,500. Alton commenced settlement discussions with the class plaintiffs' representatives more than a year before consummating their agreement. The delay in settlement was the result of Alton's financial inability to pay the amounts originally demanded, plaintiffs' tactical and strategic decisions to keep Alton as an active defendant until certain evidence had been completely introduced at trial, and the extensive investigation of Alton's financial condition. By the time Alton's settlement was executed on July 11, 1980, its financial status had been thoroughly scrutinized by Price, Waterhouse & Co. (Price, Waterhouse) and by the Plaintiffs' Steering Committee.

This court is aware from the evidence presented at the hearing on preliminary approval that by letter dated July 10, 1980, Price, Waterhouse (after summarizing the studies made of Alton's financial documents) expressed the opinion that "the proposed settlement is reasonable given Alton's current financial position, its questionable ability to obtain additional financing and the uncertain prospects for future profitable operations."

Class plaintiffs' original settlement demand to Alton was for approximately $6 million to $6.5 million per point of Alton's alleged share of the corrugated market in issue. Fearful that such a settlement would place its loan agreements in default, Alton requested special consideration, similar to that received by Consolidated Packaging Corporation (Consolidated Packaging) and Interstate Container.[4] Plaintiffs then retained the accounting firm of Price, Waterhouse & Co. to evaluate Alton's financial condition. Alton supplied requested financial data to Price, Waterhouse & Co. on several occasions, and Alton's counsel met with plaintiffs and Price, Waterhouse representatives to discuss Alton's financial status. Early in its evaluation, Price,

---

4. Both the Consolidated and Interstate settlements were approved by this court and that approval was affirmed. *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 212 and n. 26 (5th Cir.1981).

Waterhouse confirmed that Alton was indeed in a weakened financial condition.

Settlement negotiations continued during trial and after receipt of the Price, Waterhouse letter of July 10, 1980, the final settlement was effected. Alton's settlement required payment of $5,400,000 in three annual installments. This represented approximately $1.9 million per point of Alton's alleged share of the defendants' market, and was substantially higher than the amounts paid by other settling defendants suffering conceded economic difficulties at the time of settlement. Consolidated Packaging, for example, was a felony indictee which paid only $187,000 per point, and Interstate Container only paid approximately $375,000 per point. Further, Alton's settlement was almost double the amount per point paid by International Paper Company, a felony indictee and one of the largest companies in the corrugated container industry. All three of these settlements have been finally approved. As is demonstrated in Alton's Annual Report for 1979, Alton's settlement of $5,400,000 exceeded its net profit after taxes for the combined three years of 1977, 1978, and 1979 from all of its operations. Finally, as stated above, Price, Waterhouse & Co. had conducted an independent and unbiased review of Alton's financial condition and concluded, prior to the consummation of the settlement agreement, that the amount of its settlement was fair and reasonable.

This court previously has relied upon the financial information set forth in certain presentence reports filed in Cr. Nos. H–78–11 and H–78–12, in the course of finally approving other settlements in this litigation. *See Additional Findings supra.* Alton was a defendant in Cr. No. H–78–11 and furnished information to the court in this connection. Part of this information concerned Alton's financial situation.

Alton's specific agreement to cooperate with class plaintiffs was an additional, exceedingly valuable consideration of its agreement. Throughout this litigation, including most pretrial proceedings, Alton fully cooperated in the joint defense effort.

The settlement requires Alton immediately to cease and desist from further joint defense efforts during the remainder of the trial and upon any appeal of the outcome or any retrial. Alton also agreed that upon request by plaintiffs it would produce, without subpoena, any documents, information or any current employee listed on Alton's trial witness list to appear at informal conferences or consultations, or as a witness at trial for rebuttal purposes. Alton's agreement in this regard required cooperation with discovery beyond that required under the federal rules, and sharply contrasted with Alton's previous philosophy of firmly contesting plaintiffs' discovery in this litigation. After cooperating with the other defendants over a period of years and particularly during trial, this aspect of the settlement agreement was a bitter pill for Alton's counsel to swallow, but it was a condition insisted upon by plaintiffs.

Equally important, however, was Alton's agreement that this court, after preliminary approval, could order that amounts up to $920,000 be withdrawn from the Alton funds for the payment of costs and expenses (excluding attorneys' fees) incurred or to be incurred by plaintiffs in connection with prosecution of the litigation and for other purposes. Further, to the extent that any portion of the $920,000 should be withdrawn, Alton agreed that this amount would not be refunded even if its settlement were not finally approved. On October 10, 1980, plaintiffs did obtain an order directing the disbursement of the full $920,000 for payment of litigation expenses. Thus, Alton's agreement conferred another direct, immediate and substantial benefit upon the class plaintiffs, providing plaintiffs with by far their most significant source of reimbursement for litigation costs.

Further, Alton agreed, upon final court approval of the agreement, to the entry of a consent decree requested by the Sheet Plant Subclass restraining Alton from a variety of price-fixing and monopolization activities. There was little or no evidence that Alton had engaged in many of the

restrained activities; thus, this agreement conferred a substantial benefit upon the Sheet Plant Subclass which probably could not have been obtained through litigation on the merits.

Both this court and the Fifth Circuit Court of Appeals have accorded great weight to the cooperation agreements of other defendants in this litigation in finally approving their settlements as fair, adequate and reasonable. Alton's agreement conferred similar, and in some respects greater, benefits of cooperation upon the plaintiff class than the earlier settlements, and this is a substantial reason for finally approving the present agreement.

By settling with Alton, the plaintiff class received the substantial sum of $5,400,000, plus the other benefits outlined above. In addition, the plaintiffs eliminated the difficulties that Alton's affirmative case would have created for them. Had Alton remained in the case through the verdict, the jury might well have found that Alton was not a member of the alleged nationwide conspiracy or that Alton did not have a five percent impact on corrugated prices. At the time of Alton's settlement, there remained a strong possibility that the plaintiffs would not prevail in this litigation.

Finally, even if plaintiffs had ultimately prevailed against Alton at trial, there was a risk that an attempt to collect a judgment for the full damages in this case could have precipitated Alton's filing for bankruptcy or reorganization. That result might well have prolonged and complicated these proceedings and could have prevented plaintiffs' full recovery, in any event.

. The Alton settlement was negotiated at arms length, over a period of a year and a half. It represents a fair and reasonable compromise between plaintiffs' settlement demands and Alton's financial ability to pay. It provides substantial and immediate monetary benefits to plaintiffs, and important nonmonetary benefits as well, while at the same time allowing Alton to remain a viable business concern. Moreover, it left plaintiffs free to pursue the full amount of remaining damages against nonsettling defendants.

For the reasons stated herein, the court finds the settlement between the class plaintiffs and Alton Box Board Company to be fair, reasonable and adequate, and it is finally approved.

### G. Westvaco Corporation

Westvaco Corporation (Westvaco), the last defendant to settle prior to the end of the trial, entered into an agreement of settlement with the plaintiff class on September 3, 1980, agreeing, among other things, to pay the plaintiffs $975,000. This settlement was concluded after Westvaco had participated in 12 weeks of trial, well after the plaintiffs had rested their direct case and the day before the one remaining codefendant rested its defense. Accordingly, at the time of the Westvaco settlement, Westvaco's position was unique among settling defendants since all of plaintiffs' evidence against Westvaco was before the court prior to the time of the settlement.

Westvaco's participation in the trial provided plaintiffs with an opportunity to present their best case against Westvaco and provided this court with a first-hand opportunity to assess the strengths and weaknesses of plaintiffs' case against Westvaco.

The plaintiffs, throughout the course of M.D.L. No. 310, faced significant problems in proving violation, impact and damages on a class-wide basis. In addition, plaintiffs' case against Westvaco was not strong and their chances of recovering against Westvaco were remote. At the time of the settlement, Westvaco had not yet begun its defense, which would have confirmed that plaintiffs had a weak case against Westvaco. Notwithstanding the weakness of their case, plaintiffs received substantial monetary and nonmonetary benefits from this settlement.

This court expressed its recognition of the weakness of plaintiffs' case against Westvaco when it granted preliminary approval of the Westvaco settlement. Plaintiffs' case against Westvaco was extremely

thin on the facts. The record of the class action trial shows that during the alleged conspiracy period, Westvaco operated seventeen corrugated container plants in thirteen states with no plant located west of Kansas City, Kansas. After exhaustive discovery and twelve weeks of trial, there was no evidence whatsoever to suggest that employees of ten of those plants ever engaged in any pricing communications with competitors.

The weakness of plaintiffs' case against Westvaco stemmed not only from the absence of evidence against Westvaco but also from the fact that substantial exculpatory evidence concerning Westvaco was elicited during the plaintiffs' part of the trial. For example, all evidence concerning Westvaco's Buffalo, New York plant in the record is exculpatory. A former employee of Weyerhaeuser Company in Rochester, New York, testified in person that he never had a pricing communication with any Westvaco employee. He also testified that he once attempted to obtain price information by telephone from the general manager of Westvaco's Buffalo plant, but the attempt was futile because the employee hung up on him.

There were many additional examples of plaintiffs' witnesses who disclaimed ever having had pricing communications with Westvaco. Another live witness, testified that he had never been involved with Westvaco and had never even heard of Westvaco until shortly before he testified. A third witness did not know where Westvaco's nearest plant was located when he was interviewed by the Government and stated he had no communications with Westvaco. Neither Westvaco nor any of its employees was indicted by the Houston grand jury, although Westvaco had been investigated. Plaintiffs' case against Westvaco consisted for the most part of vague, speculative and uncorroborated testimony derived from a handful of grand jury transcripts, government interview statements and testimony from the criminal trial. None of this testimony was subject to cross examination by Westvaco since Westvaco, not having been indicted, was not a party to the criminal trial.

Plaintiffs produced only two live witnesses who, in the course of their testimony, referred to the possible exchange of price information by Westvaco. An employee of Consolidated Packaging Corporation in Flint, Michigan, testified to isolated communications with employees of Westvaco's Detroit plant. These alleged conversations occurred more than a decade apart, in 1963 or before, and in 1974. There is no evidence in the record of any price communications by Westvaco employees in the Detroit plant in the intervening decade. This witness himself testified that Westvaco had a reputation for not talking to its competitors. He also stated, with respect to the incident in 1974, that (i) the Westvaco employee with whom he allegedly spoke about a proposed price increase expressly refused to raise Westvaco's prices in response to this call and (ii) the alleged communication did not affect the prices charged to the account involved.

A former Mead employee testified that he exchanged past market prices with a Westvaco employee in the 1960's while they were both located in the Detroit area. However, counsel for Westvaco brought out the fact that this alleged conversation, if it took place at all, had to have taken place before 1963, which was prior to the period for which plaintiffs were claiming damages.

The weakness of plaintiffs' case against Westvaco is significant in light of the massive investigation of and discovery from Westvaco prior to trial. The depositions of twenty-nine current and former Westvaco employees were taken by the plaintiffs. In addition, plaintiffs had access to all the documents submitted to the Houston grand jury, as well as the documents produced during class action discovery, all testimony before the grand jury, and government interview statements referring to Westvaco, and the record in the corrugated container criminal trial. This massive discovery failed to support an allegation that Westvaco participated in any conspiracy as alleged by plaintiffs.

Although Westvaco settled before presenting its affirmative case, many indications in the record suggest that Westvaco's case would have been extremely effective. Westvaco submitted a lengthy witness list to the court, as part of its proposed pretrial order, which sets forth the names and anticipated testimony of fifty-one live witnesses, many of whom had already been deposed. Westvaco's witnesses included its chairman and chief executive officer, present and former managers of its Container Division, and its regional managers, plant general managers, sales managers, and representative salesmen from each of Westvaco's container plants.

Westvaco concluded its settlement negotiations with the plaintiffs on September 3, 1980, one day before the remaining nonsettling defendant rested its case. The Westvaco settlement was the product of intensive, arms-length negotiations. Westvaco initially offered to pay considerably less than the amount that was ultimately agreed upon, and the settlement amount resulted from hard bargaining between the parties.

The case presented by plaintiffs was weak and Westvaco's anticipated defense persuasive. Under these circumstances, the $975,000 paid by Westvaco after vigorous arms-length negotiations represents a fair, reasonable and adequate amount.

In addition to this financial benefit, plaintiffs received additional benefits from this settlement. In approving prior settlements in this case, the Fifth Circuit noted that "the settlements reduced the complexity of and enhanced the class' case against the non-settling defendants." 659 F.2d at 1328. This statement is true for the Westvaco settlement because it shortened an already lengthy trial by about six weeks and eliminated the possibility that Westvaco's defense witnesses might have detracted from plaintiffs' case against the codefendant.

Also, prior to the Westvaco settlement, the United States Supreme Court had granted Westvaco's petition for certiorari on the issues of whether Westvaco could assert cross claims for contribution against the settling defendants or have the plaintiffs' claims for damages reduced by amounts attributable to the settling defendants (claim reduction). As part of its settlement, Westvaco withdrew its appeal on the contribution and the claim reduction issues. At the time of the settlement, the parties could reasonably have believed this concession by Westvaco gave plaintiffs a tactical advantage.

For the foregoing reasons, the court finds that the settlement between the class plaintiffs and Westvaco is fair, reasonable and adequate, and it is finally approved.

### H.  The Flintkote Company

The Flintkote Company (Flintkote), by letter of March 13, 1980, made an irrevocable offer to pay $220,000 and interest thereon to the plaintiff class in M.D.L. No. 310 if the plaintiff class refrained from suing Flintkote as part of this litigation. Class plaintiffs accepted this offer of settlement on September 13, 1982. Flintkote is obligated to pay $319,377.02 under the settlement agreement.

In 1972, defendant MacMillan Bloedel, Inc., (MacMillan Bloedel) acquired Hankins Container (Hankins) from Flintkote. In settlement negotiations, MacMillan Bloedel represented to counsel for plaintiffs that it did not assume any of the liabilities of Hankins when it acquired that company from Flintkote. A number of Hankins employees testified before this court in both the criminal and civil trials about their history of price fixing.

Plaintiffs' initial settlement demand was $680,000. Plaintiffs agreed to a substantial discount of that settlement amount primarily to avoid: the additional expense of litigation by naming Flintkote as a defendant in the lawsuit; and the difficulties of tolling the statute of limitations for violations which occurred before the limitations period. Certainly, now that the civil jury found against plaintiffs on the issue of fraudulent concealment (the period prior to that within the statute of limitations), the Flintkote settlement appeared quite reasonable.

For these reasons, the court finds the settlement between the class plaintiffs and the Flintkote Company to be fair, reasonable and adequate, and it is finally approved.

## I. The Mead Corporation

■ On September 14, 1982, class plaintiffs entered into an agreement with The Mead Corporation. The settlement agreement with Mead accounts for the full treble damages attributable to the overcharges by Mead. It is the only settlement by any settling defendant to fully cover the treble damages attributable to that defendant's sales. Settlement agreements are usually evaluated with respect to actual damages only. See In re Corrugated Container Antitrust Litigation, 643 F.2d 195 (5th Cir.1981). It is true that Mead, like any other defendant in this case, potentially faced a judgment holding it jointly and severally liable for all of the damages caused by all of the conspirators. But a defendant's potential liability for damages caused by a coconspirator's sales need not be considered in evaluating an offer of settlement from that defendant. The Fifth Circuit did not require such an evaluation in approving the first group of settlements. However, even if the Mead settlement were tested against total damages as opposed to damages resulting from sales by Mead, the Mead settlement is adequate in view of the likelihood that during the pendency of this case Congress could change the law to allow reduction of Mead's liability to damages attributable only to its sales.

Mead is the only defendant in this massive class action antitrust litigation to remain throughout the lengthy trial and Special Master's proceedings. A jury returned a verdict of liability against Mead on September 13, 1980, finding that a conspiracy existed in the corrugated container industry to fix prices, and finding that the damages consisted of a 5% overcharge on the sales of corrugated containers and sheets to the class. The court appointed a Special Master on January 27, 1981, to determine what the 5% overcharge would translate to in a dollar amount. The Special Master's proceedings, held over a period of one and a half years, yielded evidence concerning the maximum range of those damages. By August of 1982, class plaintiffs finished the unprecedented task of presenting evidence concerning the amounts of the sales by Mead and its coconspirators during a 33 month period in 1973 through 1975 to each of approximately 160,000 class members who purchased corrugated containers and sheets during that period. This proof was expected to culminate within a matter of months in a report by the Special Master, which report might then be susceptible of summary judgment treatment or presentation as evidence at a jury trial. Mead's settlement on September 14, 1982, brought the progress of that report to a halt.

When the Mead settlement was finalized there were still some uncertainties concerning the amount and timing of the judgment itself. Although Federal Rule of Civil Procedure 23 by its express language authorizes a lump sum judgment which would include the claims of all class members, it is virtually unprecedented for such a judgment to be entered. Most large meritorious class action cases settle before the judgment. To avoid excessive expense and to ensure that the interests of all class members were protected, this court appointed a Special Master to report to him concerning the amount of sales which would be subject to the measure of damages found by the jury. Pretrial Order No. 62, January 27, 1981. However, if there were a bona fide disputed issue of the sales of Mead and its coconspirators, then presumably Mead would be entitled to a jury trial. Such a jury trial conceivably would entail proof of hundreds of thousands of sales records, and it would naturally be long and fairly complex. For these reasons, both the amount and the timing of a final judgment against Mead were uncertain.

Two primary risks of continuing litigation against Mead were the probability of the enactment of legislation which could sharply reduce the judgment, and the possibility of reversal on appeal.

On April 10, 1981, the Antitrust Equal Enforcement Act, Senate Bill 995 (S. 995), was introduced before the Senate Judiciary Committee. The legislation provides that, with respect to defendants that have settled a particular case, the courts were authorized to reduce plaintiffs' claims against non-settlers by an amount equal to treble the damages attributable to the settling company's sales. On March 31, 1982, the Senate Judiciary Committee favorably reported an amended S. 995. This version of the bill makes claim reduction applicable to pending cases when the court determines that such action would be fair.

In the House of Representatives, three bills have been introduced dealing with contribution and claim reduction. The Subcommittee on Monopolies and Commercial Law of the Committee on the Judiciary conducted five hearings on this legislation, on October 21, 1981, March 3 and 18, June 9 and September 9, 1982. The subcommittee has concluded its hearings on the legislation.

The proposed legislation was the subject of substantial lobbying efforts and has received widespread publicity. There was a clear risk to plaintiffs that this proposed legislation might have been enacted prior to the entry of a final judgment. If enacted and applied to M.D.L. No. 310, Mead's liability would have been based on its sales of approximately $300 million during the relevant time period. Even if the jury verdict were upheld, a judgment based on Mead's sales alone would have been approximately $45 million, the amount of the Mead settlement.

Regarding the second risk, the court is confident that it did not err in the conduct of the trial. Nonetheless, several of the evidentiary issues were unusual, creating uncertainties on appeal. First, few courts have considered the propriety of the admission of numerous invocations of the fifth amendment by witnesses in a civil case. The appellate issue is further complicated by the fact that many witnesses who refused to testify by claiming fifth amendment privilege in the class case have now testified in the opt-out actions. Although plaintiffs believe that reference to claims of fifth amendment privilege were altogether necessary to honestly and accurately explain to the jury the absence of testimony from most of the coconspirators, Mead argues that admissibility of this evidence may have had a prejudicial effect.

Two other evidentiary issues that certainly would be discussed on appeal, and for which there is little authority one way or another, are the introduction of grand jury testimony of witnesses other than the employees of defendants on trial (whose statements would be admissions), and the disclosure of the "Baker notes", consisting of interviews with Mead employees, voluntarily submitted by Mead's attorney.[5] The court properly permitted use of this evidence, but cases squarely on point, pro or con, simply do not exist. These evidentiary rulings are likely to be scrutinized carefully by appellate courts in this case simply because of the size of the judgment.[6]

A reasonable estimate of the 5% overcharge as found by the jury could be approximately $300 to $400 million, which amount under the law would be trebled. However, given the wide difference in the evidence submitted by Mead and the plaintiffs, the range of possible recovery could have been substantially less. If Mead prevailed on appeal, plaintiffs might have recovered nothing. The settlement fund, excluding the Mead settlement, is approximately $500 million, which amount would have been deducted from any judgment. Thus, the size of the potential judgment would have been substantially reduced.

---

5. *See United States v. Upjohn Company,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) which was decided after the class trial concluded in this litigation.

6. Petition for certiorari was granted recently in a class action antitrust suit that allowed a large measure of damages to the plaintiff class. *In re Plywood Antitrust Litigation,* 655 F.2d 627 (5th Cir.1981), *cert. granted Weyerhaeuser Co. v. Lyman Lamb Co.; Georgia-Pacific Corp. v. Lyman Lamb Co.,* —— U.S. ——, 102 S.Ct. 2232, 72 L.Ed.2d 844 (1982).

Furthermore, had claim reduction legislation passed the Congress during the pendency of this litigation, any judgment against Mead could have been reduced to approximately $45 million. Considering the range of possible recovery, this settlement is fair, adequate and reasonable, whether considered individually or as part of the entire amount achieved in this case. The total settlements with accrued interest exceed $550 million, the highest amount ever achieved in class action litigation. The total settlement amount substantially exceeds the total estimated single damages incurred by the class.

Mead was acquitted in the criminal case, and had no employee indicted. Mead had only a three percent share of the market. Mead's agreement to pay $45 million plus 9.5 percent interest is the highest settlement by far of any of the settlements in this litigation. It represents triple the damages attributable to Mead's sales. Continental Group paid $6.5 million per market-share point, the highest of the felony indictees. Inland Container Corporation paid $4.75 million per market-share point, the highest of the misdemeanor indictees. MacMillan Bloedel paid $4.0 million per market-share point, the highest of the unindicted defendants. Weyerhaeuser Company, with over twice Mead's market share, paid $39.15 million, or $5.0 million per market-share point, the highest total amount of any defendant other than Mead. No defendant other than Mead paid in settlement an amount in excess of single damages attributable to its sales. Thus, the Mead settlement is significantly greater than any of the other settlements made in this litigation. Finally, it is about that for which Mead would be liable in the event the jury's verdict were sustained, but claim reduction legislation enacted.

Finally, plaintiffs analyzed the amount of a possible settlement with Mead against its available resources. The forest products industry generally has been particularly hard hit by the current recession and many companies within the industry, including Mead, are losing money in 1982. Mead has reported operating losses in every quarter in 1982

including an operating loss of $37.9 million in the third quarter and an after tax loss of $20.2 million. This and other financial information concerning Mead are contained in Mead's press release of October 14, 1982. Additionally, many forest products companies including Mead, have reduced their third quarter dividends by 50% or more. Obviously, plaintiffs could not realistically expect to execute a judgment in the hundreds of millions of dollars against a company the size of Mead in view of its relative financial resources. In this light, the $45 million is fair, adequate and reasonable. These financial uncertainties were compounded by the risk of delay, and made more attractive the eventual settlement with Mead which settlement is insured by an insurance company.

The Mead settlement concludes the class litigation in M.D.L. No. 310. Without the Mead settlement, this already protracted litigation promised to continue for years through review by both the Fifth Circuit and the Supreme Court.

For the reasons stated herein, the court finds the settlement between class plaintiffs and The Mead Corporation to be fair, reasonable and adequate, and it is finally approved.

## IV. CONCLUSION

■ The settlement agreements summarized herein were the result of months of negotiations between experienced antitrust lawyers who were, and are, thoroughly capable of weighing both the benefits of settlement to the class and the defendants' ability to respond in damages. Negotiations for the class plaintiffs were conducted by members of the Plaintiffs' Steering Committee who had participated in other large, complex class action litigation. Both the Container Purchaser and Sheet Plant Subclasses were fully and adequately represented during negotiations, and representatives of both subclasses executed the settlement agreements. Considering all settlements collectively, which is appropriate for the reasons given by the court in its *Addi-*

*tional Findings* pertaining to earlier settlements, it is clear that they exceed the possible recovery of actual damages through litigation in this cause.

The compromise of complex litigation is favored both by strong judicial policy and public policy.[7] Due to their uncertainty, difficulty of proof, and length, and in the interest of judicial economy, class action damage suits should be settled whenever possible, as soon as possible.

ACCORDINGLY, the court finds and concludes that:

1. Plaintiffs' motion for final approval of the settlements of the plaintiff class with defendants Southwest Forest Industries, Inc., Packaging Corporation of America, Fibreboard Corporation, Georgia-Pacific Corporation, Potlatch Corporation, Fibre Box Association, Crown Zellerbach Corp., Alton Box Board Company, Westvaco Corporation, The Flintkote Company, and The Mead Corporation be and the same hereby is GRANTED.

2. By separate order, a final judgment of dismissal with prejudice of claims of class members as to the defendants listed above is entered, except that the court retains jurisdiction over the plaintiff class and these defendants for the purpose of effectuating the settlements and directing the distribution of the settlement fund.

---

**7.** *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322, 1325 (5th Cir.1981); *Pfizer Inc. v. Lord* 456 F.2d 532 (8th Cir.1972), *cert. denied* 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972) (The policy of the law encourages compromise to avoid the uncertainties of the outcome of wasteful litigation and expense incident thereto).